**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO. |
| | ) | 2:25-CV-16049 |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Motion date: March 16, 2026 |
| | ) | |
| TOVA FRY, ET AL., | ) | |
| Defendants | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# **Table of Contents**

TABLE OF AUTHORITIES

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

I.    INTRODUCTION ...................................................................................................... 1

II.   FACTS ALLEGED .................................................................................................... 2

III.  ELEMENTS OF THE FACE ACT .......................................................................... 3

IV.   FED. R. CIV. P. 12(b)(6) REQUIRES FACTS SUFFICIENT TO MAKE A CLAIM PLAUSIBLE. ............................................................................................................ 4

V.    ARGUMENT ............................................................................................................ 4

    A.    The Government Fails to Plausibly Allege that Fry's Delivery of a Cease-and-Desist Letter to Glick's Home, and Photographing the Front of the Home, are Threats of Force that Constitute True Threats Undeserving of First Amendment Protection...................................... 4

    B.    Moshe Glick's Private Residence is Not a Place of Religious Worship Under the FACE Act……………………………………………………………………………………9

    C.    The Facts Plead are Insufficient to Support a Claim that Fry Physically Obstructed Access to the Land Sale Event..................................................................................................11

    D.    The Facts Plead Fail to Adequately Allege that Fry Engaged in Actions *Because* she Intended to Interfere with Anyone's Religious Freedom........................................................ 13

    E.    A Real Estate Fair is Not a Form of Jewish Religious Observation. ................................ 16

    F.    The Complaint Fails to State an Injury That is Fairly Traceable to the Defendant, Violating Fed. R. Civ. P. 12(b)(1). ............................................................................................. 19

VI.   FRY RESPECTFULLY RESERVES THE RIGHT TO JOIN IN THE MOTIONS FILED BY ANY CO-DEFENDANT TO THE EXTENT THEY APPLY ...................................................... 20

VII.  CONCLUSION......................................................................................................... 21

## **TABLE OF AUTHORITIES**

## **CASES**

*Allen v. Wright*, 468 U.S. 737 (1984) ..............................................................................20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................4

*Clapper v. Amnesty Int'l. USA*, 568 U.S. 398 (2013) .....................................................20

*Connelly v. Lane Const. Corp*, 809 F.3d 780 (3d Cir. 2016)......................................4, 12

*Counterman v. Colorado*, 600 U.S. 66 (2023) ...............................................................5

*Grand v. City of University Heights, Ohio*, 2024 WL 4403700 (N.D. Ohio Oct. 1, 2024), affirmed by *Grand v. City of University Heights, Ohio*, 159 F.4th 507 (6th Cir. 2025) ..................... 5-6, 10

*Grande v. Starbucks Corp.*, No. 18-04036, 2019 WL 1455445 (E.D. Pa. Apr. 1, 2019)..............13

*Helmann v. Codepink et al.*, 2025 WL 3030582 (C.D. Cal. Jun. 13, 2025)................8 n.4, 18 n.10

*Helmann v. Codepink et al.*, 2025 WL 2673633 (C.D. Cal. Aug. 13, 2025)...................................8

*Hynson ex rel. Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026 (3d Cir. 1988) .................13

*In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997) ...............2 n.1

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996)...........................................................13

*Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F.4th 47 (2d Cir. 2021) ......................9-10

*Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994).........................................19

*LePore v. SelectQuote Ins. Servs., Inc.*, 2023 WL 8469761 (3d Cir. Dec. 7, 2023) ......................2

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014)................20

*Lotierzo v. A Woman's World Med. Ctr.*, 278 F.3d 1180 (11th Cir. 2002) ......................................3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)............................................................... 19-20

*Morse v. Lower Merion School District*, 132 F.3d 902 (3d Cir. 1997) ....................................4, 12

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)............................................................5

*Native Village of Kivalina v. Exxon Mobil Corp.*, 696 F.3d 849 (9th Cir. 2012) ..........................20

*New Beginnings Ministries v. George*, 2018 WL 11378829 (S.D. Ohio Sep. 28, 2018) ..........3, 13

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058 (9th Cir. 2002), *as amended* (July 10, 2002)...........................................................5, 9

*United States v. Dillard*, 795 F.3d 1191 (10th Cir. 2015)..................................................9

*Virginia v. Black,* 538 U.S. 343 (2003) ...........................................................................5

*Washington v. Warden SCI-Greene*, 608 F. App'x 49 (3d Cir. 2015)...........................12

## STATUTES

Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248................................ *passim*

## LEGISLATIVE MATERIALS

H.R. Conf. Rep. No. 103-488, 9 (1994)............................................................................12

S. Rep. 117, 103d Cong. 1st Sess. 31 (1993) ..................................................................12

## RULES

Fed. R. Civ. P. 8(a)(2) ................................................................................................ 12-13

Fed. R. Civ. P. 8(d)(1) ....................................................................................................13

Fed. R. Civ. P. 10(b).......................................................................................................12

Fed. R. Civ. P. 12(b)(1) ..................................................................................................19

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 2 n.1, 4, 18 n.10

## MISCELLANEOUS

*A List of the 613 Mitzvot (Commandments)*, Judaism 101 (last visited Feb. 19, 2026), https://www.jewfaq.org/613_commandments ...............................................................16

Department of Justice, *Justice Department Files Lawsuit Under the FACE Act Against Violent Protestors at Synagogue in West Orange, New Jersey* (Sep. 29, 2025), https://www.justice.gov/opa/video/justice-department-files-lawsuit-under-face-act-against-violent-protestors-synagogue-west ..............................................................................................1

Dr. Rabbi Zev Farber, *Prohibition of Meat and Milk: Its Origins in the Text*, TheTorah.com (last visited Feb. 19, 2026), https://www.thetorah.com/article/prohibition-of-meat-and-milk-its-origins-in-the-text ...............................................................................................................18

*Halakhah: Jewish Law*, Judaism 101 (last visited Feb. 19, 2026), https://www.jewfaq.org/jewish_law...............................................................................17

Liora Halperin, *Origins and Evolution of Zionism*, Foreign Policy Research Institute (Jan 9. 2015), https://www.fpri.org/article/2015/01/origins-and-evolution-of-zionism/ .......................... 18

International Committee of the Red Cross, *Occupation*, ICRC (last visited Feb. 19, 2026), https://www.icrc.org/en/law-and-policy/occupation ........................................................ 1

Matthew 21:12–17, Mark 11:15–19, Luke 19:45–48, & John 2:13–16, Bible Gateway (last visited Feb. 19, 2026), https://www.biblegateway.com/passage/?search=Matthew+21%3A12-17,Mark+11%3A15-19,Luke+19%3A45-48,John+2%3A13-16&version=NRSVUE ................. 19

My Jewish Learning (last visited Feb. 19, 2026), https://www.myjewishlearning.com/article/moshe-feinstein/ ........................................ 17

My Israel Home (last visited Feb. 19, 2026), https://www.myisraelhome.com/ .......................... 15

Rabbi Avi Zakutinsky, *The Mitzvah of Making Aliyah (Living in Israel) Today*, OU Torah (last visited Feb. 19, 2026), https://outorah.org/p/27212/ .................................................... 17

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)</u>

### I.    <u>INTRODUCTION</u>

Hosting in-person events for real estate speculators to sell land in Israel have been met with protests around the United States, due to the fact that such real estate fairs often market land that is outside of the internationally-recognized borders of the State of Israel. Territory occupied because of conquest is treated, under international law, as remaining the territory of the occupied people, and may not be appropriated by the occupier. *See, e.g.*, International Committee of the Red Cross, *Occupation*, ICRC (last visited Feb. 19, 2026), https://www.icrc.org/en/law-and-policy/occupation. In other words, these real estate fairs sell stolen land.

The current administration broadly supports Israel's expansionist and settlement policies and the confiscation of Palestinian land. It has also engaged in a concerted legal effort to stifle protest against these policies, in the guise of fighting anti-Semitism. Indeed, Harmeet Dhillon, the head of the Civil Rights Division of the Department of Justice (DOJ), held a press conference boasting that this was the DOJ's first use of the FACE Act against demonstrators outside of a house of worship and stated: "We're excited to see this case unfold." Department of Justice, *Justice Department Files Lawsuit Under the FACE Act Against Violent Protestors at Synagogue in West Orange, New Jersey* (Sep. 29, 2025), https://www.justice.gov/opa/video/justice-department-files-lawsuit-under-face-act-against-violent-protestors-synagogue-west.

Plaintiff (hereinafter "Government") alleges that Defendant Tova Fry (hereinafter Fry) violated the FACE Act by forcing the re-location of one of these land-sale events from a private home to a synagogue, by threats of force. Somewhat more opaquely, the Government suggests that Fry used physical force to obstruct access to the synagogue where the event was held. As set forth herein, the Government fails to allege facts adequate to support its asserted causes of action.

1

## II.    <u>FACTS ALLEGED</u>

The Government alleges that one Moshe Glick decided to host an "Israel real estate fair," which the Complaint characterizes as "a religious event centered on the Jewish obligation to live in the land of Israel, a tenet of Jewish Faith." Complaint at 5. The event was to take place in Glick's home, in a room used for "prayer and study." *Id.*

The Government further alleges that Fry was "recorded on a Ring camera" delivering a "threatening letter to Glick's home . . . demanding cancellation of the event or threatening legal action*." Id.* at 6. Fry photographed the front door where she left the letter. *Id.* The Government alleges that in photographing where she had served the letter Fry was "indicating an intent to disseminate the location of his home to others," which Glick "interpreted" "as a serious threat of harm[.]" *Id.*

The letter Fry delivered is attached to the declaration of Ronald L. Kuby as Exhibit A.[1]  It is a "cease-and-desist" letter that warned Glick of potential legal consequences if he held an event which, in the view of the dozens of lawyers and legal organizations that signed the letter, violated various state, federal, and international laws.

According to the Complaint, when Glick discovered that there was going to be a protest outside the event, he elected to move the event to a local synagogue. The Government further alleges that numerous other demonstrations took place at various times and at various locations around the country, including one in nearby Bergenfield, New Jersey, on November 7, 2024, which the Government characterizes as "a violent protest." *Id.*

---

[1] The letter is explicitly relied upon, cited from, and integral to the Complaint. It is therefore properly before the Court pursuant to Rule 12(b)(6) without converting the motion into one for summary judgment. *See, e.g.*, *LePore v. SelectQuote Ins. Servs., Inc.*, 2023 WL 8469761 at *2 (3d Cir. Dec. 7, 2023); *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997).

Based upon these allegations, the Complaint alleges that Fry's actions forced the relocation of the event from Glick's home to a synagogue, and that "these actions constituted a "true threat" as a reasonable person would foresee that Fry's conduct would be interpreted as a serious threat of harm, particularly given prior incident like the November 7, 2025 Bergenfield protests." *Id.*

There are two brief mentions of Fry's conduct the day of the protest. First, during the protest, she "asked Dragon, 'Where is the entrance?' (referring to the synagogue). Dragon responded to Fry and said that the synagogue was the next building over." *Id.* at 10. Second, that "Fry joined a mob that broke through a police line, marched onto Congregation Ohr Torah synagogue property and physically obstructed worshippers from accessing the religious event[.]" *Id*. at 4.

### III.   ELEMENTS OF THE FACE ACT

The Freedom of Access to Clinic Entrances Act (FACE Act) was passed in 1994, when women's health clinics were being bombed and doctors who worked there were being murdered. A far lesser-known provision in the bill protects places of worship. The law's "place of worship" cause of action has so seldom been invoked that caselaw interpreting this provision is scarce. Defendants could find no cases from the Third Circuit where such a suit has been decided. Other circuits, however, have identified four elements required to plead a violation of 18 U.S.C. § 248(a)(2): "Plaintiffs must demonstrate that Defendants used or attempted to use (1) force, threat of force, or physical obstruction; (2) with the intent to; (3) injure, intimidate, or interfere with a person; (4) because that person is exercising or is seeking to exercise his or her right of religious freedom at a place of religious worship." *New Beginnings Ministries v. George*, 2018 WL 11378829 at *15 (S.D. Ohio Sep. 28, 2018) (citing *Lotierzo v. A Woman's World Med. Ctr.*, 278

3

F.3d 1180, 1182 (11th Cir. 2002) (citations omitted). The Government has failed to adequately plead *any* of these elements, much less all of them.

### IV.    FED. R. CIV. P. 12(b)(6) REQUIRES FACTS SUFFICIENT TO MAKE A CLAIM PLAUSIBLE.

A claim is facially plausible only when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The allegations must be enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548 (2009). A complaint does not require detailed factual allegations, but it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678. Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleading facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. *Id.* at 679. *See also*, *Connelly v. Lane Const. Corp*, 809 F.3d 780, 789-790 (3d Cir. 2016) (assertions such as that the plaintiff was "sexually harassed" and including statutory language in place of facts will be disregarded); *Morse v. Lower Merion School District*, 132 F.3d 902, 906 n.8 (3d Cir. 1997) (bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments should be disregarded).

### V.    ARGUMENT

**A. The Government Fails to Plausibly Allege that Fry's Delivery of a Cease-and-Desist Letter to Glick's Home, and Photographing the Front of the Home, are Threats of Force that Constitute True Threats Undeserving of First Amendment Protection.**

The only speech prohibited by the FACE Act is that which uses "threat of force . . . [t]o intimidate or interfere with . . . or attempt to intimidate or interfere with any person lawfully

exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. 248(a)(2). A "threat of force" under the FACE Act must be a "true threat." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1070 (9th Cir. 2002), as amended (July 10, 2002); *see also*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933 (1982). Under the Supreme Court's threat jurisprudence, speech only constitutes a "true threat" when "in the entire context and under all the circumstances, a reasonable person would foresee [it] would be interpreted by those to whom the statement is communicated as a serious expression of intent to inflict bodily harm upon that person." *Planned Parenthood of Columbia/Willamette,* 290 F.3d at 1077.

To lose First Amendment protections, the statement must be a "serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black,* 538 U.S. 343, 359 (2003). Yet, the "reasonable person" objective standard alone is insufficient to protect fundamental First Amendment rights. Recently, the Supreme Court held that one who utters such a threat faces liability only where they act with recklessness, or a higher degree of *mens rea*, such that a defendant must have "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). Nothing in the complaint alleges or plausibly shows that Fry had the requisite subjective recklessness mental state.

In a case remarkably similar to this, and one of only four cases Defendants found that were brought under the FACE Act's religious freedom subsection, the court in *Grand v. City of University Heights, Ohio* recognized the absurdity of the Plaintiff's claim that Defendants' threat of legal action was a "threat of force" under the FACE Act. 2024 WL 4403700, at *16-17 (N.D. Ohio Oct. 1, 2024), affirmed by *Grand v. City of University Heights, Ohio,* 159 F.4th 507 (6th Cir.

2025). Grand was an Orthodox Jew who invited his neighbors to multiple prayer services at his home. The Law Director for the City of University Heights sent Grand a cease-and-desist letter notifying him that because his home was in a residential use zoned area, use of it "as a place of religious assembly and/or in operation of a shul or synagogue is prohibited" and that "[v]iolation of the City's ordinances in this manner may result in building code citations against [him] and in the pursuit of additional remedies." The district court found that this was not a "threat of force" and dismissed the claim with prejudice.[2] *Id.*

Here, Fry simply delivered a letter threatening legal action. The Government pleads no facts to indicate that Fry read the letter, wrote the letter, or signed the letter. She did not deliver it during the night. She did not have a weapon. It is immensely unclear what at all about the delivery of this letter could possibly be a threat of force. Fry's role was tantamount to that of a process server.

The Government claims that Fry's delivery of the letter was "intended to intimidate Glick as a threat by signaling that she knew where he lived." Complaint at 4. Yet, the far more plausible interpretation is that Fry delivered the letter to Glick's home because that is where one delivers mail to a person, by hand because that is one of the commonly understood ways one delivers legal mail. The Government claims that Fry taking a picture of Glick's home "indicat[ed] an intent to disseminate the location of his home to others." *Id.* Again, there is a far more plausible interpretation: Fry took a picture to document proof of service.[3] Moreover, the court in *Grand*

---

[2] Notably, while Grand brought other claims against the Law Director, who actually delivered the threat of legal action, he only brought FACE Act claims against the City and the Mayor. *See Grand,* 2024 WL 4403700, at *16.

[3] The Government's baseless assertions that Fry intended to signal anything to Glick rest on the unpled assumption that Fry even knew Glick had a Ring camera. For example, for Fry to be "signaling" anything to Glick by taking a picture of the outside of his home, let alone signaling something that would foreseeably be a threat of force, she would have to know that Glick would

definitively states what common sense makes clear: the threat of legal action is not a threat of force under the FACE Act.

The Government fails to plausibly allege that any of Fry's actions constituted a true threat. These factual allegations fall far short of even remotely making out a claim that the contents of the letter, the manner of its delivery, and photographing the outside of Glick' home constituted a proscribed "threat of force."

*Iqbal* and *Twombly* demand that rhetoric must be tethered to facts and that theories be supported by enough of those facts to at least make the theories plausible. Indeed, where two different interpretations may be made of the same facts, Plaintiffs must state further facts making the "true threat" claim probable, rather than merely plausible. *See Twombley*, 550 U.S. at 557. The Government's numerous interpretations—sinister and straining credulity—do not come close.

Nor does the Government's "context" transform Fry's non-violent actions into a true threat. The Government's allegation that "Glick discovered social media posts on pro-Palestinian social media accounts publicizing his home address as the location of a planned protest" is irrelevant. *See* Complaint at 7. The Government does not allege that Fry had any connection to these posts, or that publicizing the site of a protest is anything more than protected First Amendment activity. So too with the alleged "pattern of similar incidents" and specifically cited "violent protest organized by AMP's national organization and others outside Adas Torah Synagogue in Los Angeles in June 2024." *Id.* These events, which Fry isn't alleged to have any connection to, are irrelevant in a true threat analysis as to Fry's actions *vel non*, in this case. The same is true for the

_____

know she took the picture. Even beyond knowing about the presence of the Ring camera, she would have had to know that Glick paid for a Ring service subscription that saved video, that he reviewed that Ring camera video, or that someone was constantly monitoring the Ring camera. This is just the type of rhetoric devoid of facts that *Twombly* warns against. *See Twombley*, 550 U.S. at 557.

cited November 7, 2024 Bergenfield protest, which the Government characterizes as "violent" without asserting a single fact to support that characterization, or offering any explanation of the relevance as to Fry.

Interestingly, the referenced Los Angeles protest gave rise to a civil case, *Helmann v. Codepink et al.*, 2025 WL 2673633 (C.D. Cal. Aug. 13, 2025).[4] The opinion in that case is a pointed repudiation of the Government's attempt to use unrelated context to manufacture a true theat. The district court found that Plaintiffs failed to connect Defendants' conduct to allegations regarding historical anti-Semitism, and that the events Plaintiff described were "irrelevant" where they did not "directly involve [the defendants]." *Id.* at *3, n.5. The Court goes even further, noting that defendant's "prior violent and disruptive protests also do not add sufficient context to make" defendant's actions a threat, and "its potential history of violence is irrelevant—that a person has committed violence once does not necessarily mean that everything they say in the future will be violent or threatening." *Id.* at *6. The Government's failure in this case to connect any of the alleged context to Fry mirrors Plaintiffs' failure in *Codepink.* The context alleging historical anti-Semitism and recent protests is irrelevant.

Finally, although the issue hasn't come before the Third Circuit, other circuits have found that if a statement on its face is non-violent, context cannot be manufactured to create a true threat.

---

[4] This case generated two decisions. The first was *Helmann v. Codepink et al.*, 2025 WL 3030582 (C.D. Cal. Jun. 13, 2025). There, the district court granted in part and denied in part Defendants' Motions to Dismiss. The Court dismissed the case without prejudice with respect to all Defendants except Codepink, whose Motion was denied. The second decision, *Helmann v. Codepink et al.*, 2025 WL 2673633 (C.D. Cal. Aug. 13, 2025), is the one cited herein. After Plaintiffs failed a staggering three times to sufficiently amend their flawed complaint, and despite a DOJ statement of interest in Plaintiffs' favor, the court ultimately dismissed the case *with prejudice* for all Defendants except Codepink, for whom the parties then stipulated dismissal.

*See, e.g.*, *United States v. Dillard*, 795 F.3d 1191 (10th Cir. 2015); *Planned Parenthood of Columbia/Willamette*, 290 F.3d at 1070.

### B. Moshe Glick's Private Residence is Not a Place of Religious Worship Under the FACE Act.

The Complaint alleges that the Israel real estate event was to be held at "Glick's private home . . . in a room designated for communal prayer and study, containing a Jewish library with prayer books and scared texts, where he hosted numerous prayer groups." Complaint at 5. More important are the facts the Government fails to allege about this "place." It fails to allege that Glick's private home is a "place of religious worship" or a location devoted primarily to religious worship. Nor does the Government allege that Jews collectively recognize, or Jewish leadership has designated, Glick's home as a place primarily for religious worship. The Government does not allege that his home is exempt from paying property taxes, has 501(c)(3) status, or that Glick is exempt from paying sales tax on items purchased for his home.

These failures are dispositive. This issue has not yet come before the Third Circuit, but in a case a first impression, the Second Circuit exhaustively analyzed the "house of worship" provision of the FACE Act. *Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F.4th 47 (2d Cir. 2021). In *Jingrong*, members of the anti-Communist religious group Falun Gong set up literature tables in various areas of downtown Flushing, New York, where they would distribute proselytizing literature, anti-Chinese Communist Party propaganda, and engage in various prayer activity. The question before the Second Circuit was whether these tables were "places of religious worship" under the FACE Act. They were not.

The Second Circuit began by noting that the phrase "place of religious worship" was not defined in the Act, and that it, "in context, is susceptible to multiple reasonable interpretations."

*Id.* at 57. Lacking a "plain meaning," the Second Circuit mined the rich vein of legislative history and held:

> We conclude that the legislative history compels reading the phrase 'place of religious worship' to mean a place recognized or dedicated as one primarily used for religious worship.

*Id.* at 58. The Second Circuit specified that a place where *some* religious worship occurs is *not* sufficient to make a place one of "religious worship." *Id.* at 61. "Rather [the Court] must determine whether there is sufficient evidence for a reasonable jury to conclude that the primary purpose of [a place] is religious worship." *Id.*

> As directly applicable here, the Second Circuit found:

> It makes sense that Congress would not have intended the scope of covered places to extend to the wide variety of locations where an individual may engage in religious worship, but which are not primarily used for that purpose, *such as one's home*.

*Id.* at 59 (emphasis added). While a place of worship need not be a permanently fixed structure, it must at least be a place where "religious adherents collectively recognize, or religious leadership designates the place as primarily one for religious worship." *Id.* Moshe Glick's home, based upon the facts alleged in the pleadings, does not come close.

In *Grand*, the court found that "[t]he holding in *Jingrong* is persuasive," and dismissed Plaintiff's Face Act claim with prejudice. *Grand,* 2024 WL 4403700 at *17. The *Grand* court explained that for the "FACE Act claim to survive, Grand would have to present facts that his home was 'primarily used for religious worship,' which he cannot do." *Id.*

Because the Government has not plausibly alleged that Glick's home is "a place of religious worship" under the FACE Act, it cannot sustain any cause of action based on "forcing the relocation of the event." *See* Complaint at 2.

### C. The Facts Plead are Insufficient to Support a Claim that Fry Physically Obstructed Access to the Land Sale Event.

It is not clear from the Complaint whether the Government is claiming that Fry obstructed access to the actual land sale event that was held in the synagogue, or whether the claim against her is confined to alleging a FACE Act violation based upon her serving the cease-and-desist letter and taking a photograph of Glick's home.

In the "Cause of Action" section of the Complaint, the allegations against Fry focus exclusively on her constitutionally-permitted actions that the Government claims "intimidated" Glick into relocating the event. *Id.* at 17. Similarly in the "Cause of Action" section, but with regard to Defendants writ large, the Government alleges:

> Defendants' conduct caused actual intimidation and interference because individuals refrained from attending the event out of fear and reasonable apprehension of bodily harm to themselves and others. The worshipers present at the event were unable to fully participate as planned due to Defendants' disruption and the eventual relocation of the religious service.

*Id.* at 19. This passage seems to conflate the original event at Glick's home with the demonstration outside of the synagogue, where the event was relocated. It does not allege that anyone was impeded in their efforts to attend the synagogue land sale, as opposed to the event planned for Glick's home.

On the other hand, in the "Parties" section, the Government alleges that "Fry joined a mob that broke through a police line, marched onto Congregation Ohr Torah synagogue property and physically obstructed worshippers from accessing the religious event[.]" *Id.* at 4.

Yet, in the "Factual Background" section, the only allegation about Fry's conduct on the day of the event is that, during the protest, she "asked Dragon, 'Where is the entrance?' (referring to the synagogue). Dragon responded to Fry and said that the synagogue was the next building over." *Id.* at 10.

This hodge-podge of different and inconsistent claims about just what it was that Fry did on November 13, 2024, alone should justify dismissal. Even more, taking the allegations individually only adds to the confusion. For example, the "Parties" section allegation that Fry was part of a group that "physically obstructed worshippers" from attending the November 13, 2024, event does not add any guidance as to what the Government claims Fry actually did. *Id.* at 4. Under the FACE Act, the term "physical obstruction" means rendering impassable ingress to or egress or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous. 18 U.S.C. § 248(e)(4). Thus, the allegation that Fry "physically obstructed" the event is a bare recitation of statutory language—not a factual allegation as is necessary. *See, e.g., Connelly*, 809 F.3d at 790 (allegations that defendant "sexually harassed" her is a legal conclusion); *Morse*, 231 F.3d at 908 (a claim "that harm ultimately caused was a foreseeable and a fairly direct result of the state's actions" is a legal conclusion and not a factual allegation). *See also*, S. Rep. 117, 103d Cong. 1st Sess. 31 (1993) (explaining that "physical obstruction" would include blockades, "chaining people and cars to entrances with bicycle locks," strewing nails on public roads leading to clinics, and "blocking entrances with immobilized cars"); H.R. Conf. Rep No. 103-488, 9 (1994) (clarifying that physical obstruction would include, for example "physically blocking access to a church or pouring glue in the locks of a synagogue").

This type of "shotgun pleading" is impermissible. "Shotgun pleadings," also described as "impermissible 'group' pleadings," are prohibited by Federal Rules of Civil Procedure 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief, and 10(b), which requires numbered paragraphs in a complaint, each to be "limited as far as practicable to a single set of circumstances." "Each averment must be 'simple, concise, and direct.'" *Washington v. Warden SCI-Greene*, 608 F. App'x 49, 52 (3d Cir. 2015) (quoting Fed. R.

Civ. P. 8(d)(1). Rules 8(a), as well as 8(d)(1), show the importance of "clarity and brevity." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 702 (3d Cir. 1996). The Third Circuit critiqued the "the all too common shotgun pleading approach" to complaints in *Hynson ex rel. Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988). District courts have since established that while there "are several characteristics that can make a complaint a shotgun pleading, they all have in common one thing: failure to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* (quoting *Grande v. Starbucks Corp.*, No. 18-04036, 2019 WL 1455445, at *3 (E.D. Pa. Apr. 1, 2019).

In alleging any cause of action with respect to events on the day of the protest, the Government consistently refers to the "Defendants' actions," what "Defendants' conduct caused," and what "Defendants' actions reflect," without specifying which defendants (or what conduct) it is actually referring. *See* Complaint at 19. This impermissible "shotgun" pleading is precisely what *Twombly* made clear runs afoul of the "fair notice" requirement. *See Twombly*, 550 U.S. at 555 (The lack of explicit references to named Defendants makes it impossible to give these Defendants "fair notice" of the claims asserted and the grounds upon which those claims rest.)

### D. The Facts Plead Fail to Adequately Allege that Fry Engaged in Actions *Because* she Intended to Interfere with Anyone's Religious Freedom.

A violation of the FACE Act's religious exercise subsection requires that Defendants act "*because* [Plaintiff] is exercising or is seeking to exercise his or her religious freedom." *New Beginnings Ministries*, 2018 WL 11378829 at *3. Even if the real estate fair was an exercise of religious freedom, the Government fails to plausibly allege Fry intended to injure, intimidate, or interfere with anyone *because* of their exercise of religious freedom.

The Government alleges no facts to show that Fry knew or should have known that this event would be a protected exercise of religion expression, especially since the land sale event was

originally being hosted in a private home. The event itself took place on November 13, 2024. This was not a Jewish holiday. It took place on a Wednesday, not the day of the Jewish sabbath. The few facts the Government tacks on describing some religious content to the program are irrelevant since the Government alleges nothing to show that Fry knew or should have known of these added features. *See* Complaint at 8-9.[5]

The Government claims that the letter Fry delivered "demand[ed] cancellation of the planned religious event." *Id.* at 4. Yet, despite the Government's repeated assertion that this was a religious event, the actual letter that was delivered, which the complaint quotes from, focuses exclusively on the illegal land sale. *See, e.g.*, Exhibit A, at 1, 8.[6]

Embedded in the Complaint Image 2, captioned "Screenshots of AMP social media posts," is the advertisement for the real estate sale. Complaint at 8. The advertisement boasts "magnificent Jerusalem projects," with "deals with no interest" and "special discounted pricing," at an event to talk "about buying 'existing properties.'" *Id*. The Government describes the flyer as "from a Jewish organization advertising eight cross-country events," including "Glick's event." *Id*. at 7. Yet, the Government's characterization of this organization as a "Jewish organization," is yet another baseless characterization poorly disguised as a fact. The sponsoring organization is not a "Jewish

---

[5] What's more, the Government does not allege a single specified fact about what was planned for the event at Glick's home. In the few details the Government provides on what was to occur, it specifies that the plans were for the event at the synagogue. It includes details that cannot apply to what was supposed to happen at Glick's house, such as "a festive barbecue in the synagogue's parking lot[.]" Complaint at 8-9.

[6] On page 1, the letter states: "We write concerning an event scheduled to be hosted, organized, supported, and/or promoted by you and your organization or corporate entity wherein Israeli and Israeli affiliated groups, and other unknown groups are reportedly promoting, showcasing, offering information about, and possibly offering for sale illegally secured land in the West Bank and East Jerusalem." On page 8, the letter describes, "an event where Israeli groups are selling land in the West Bank and the Gaza Strip, which are considered occupied Palestinian territories under international and U.S. law, are in violation of numerous international laws and norms[.]"

organization," it is a real estate company.[7] The flyer directs RSVPs to Gedaliah Borvick,[8] the "Founder and Team Manager" at My Israel Home, which Mr. Borvick himself describes as "a brokerage firm dedicated to helping families from abroad navigate the complex process of buying and selling homes in Israel." *About Us*, My Israel Home (last visited Feb. 19, 2026), https://www.myisraelhome.com/about-5. The flyer is a real estate advertisement. It makes no mention of religion, prayer, worship, Judaism, or anything at all about the exercise of religion. The Government's addition of the word "Jewish" cannot here, or anywhere, make this a religious event.

The Government does not even make the bare assertion that any of Fry's specifically alleged actions were motivated by any anti-Semitic beliefs, were because of the alleged religious nature of the event, or were to prevent religious exercise in any way. The Government's conclusory assertions that lump all Defendants' alleged conduct together are wholly insufficient to plead Fry's specific intent. In one such instance, the Government alleges that "[t]he Defendants' actions were motivated by the religious nature of the event and the Jewish identity—both as a race and religion—of the worshipers." Complaint at 19. Yet, it provides no facts suggesting this against Fry, and simply restates elements of the FACE Act with no facts or analysis. This is another example of an impermissible shotgun pleading. There is no reason to understand that this allegation against "the Defendants" writ large includes Fry. This is especially clear since, on the same page, the Government describes the "Defendants' actions" as ones that clearly do not and are not alleged to involve Fry.[9] *See id.*

---

[7] *See supra* n1.

[8] The flyer notes to email gborvick@gmail.com to receive the address and have your name put on the list. Borvick puts the same email address on the My Israel Home website. Its home page reads: "Navigate Real Estate in Israel. We could sell you a dream . . . But we'd rather guide you to buy smart." My Israel Home (last visited Feb. 19, 2026), https://www.myisraelhome.com/.

[9] For example, the Complaint alleges, "Defendants' actions reflect a pattern of targeting Jewish religious institutions, as evidenced by the Bergenfield and Los Angeles incidents, thus

These conclusory and generalized assertions are wholly insufficient to show that Fry intended to injure, intimidate, or interfere with anyone because of their exercise of freedom of religion. To the extent the Government is alleging any cause of action against Fry based on her attendance at the protest, the few facts the Government alleges do nothing to show she knew or had any reason to know this would be a religious event. The Government repeatedly fails to plausibly show that Fry had the requisite intent to prevent anyone from exercising their religious freedom.

### E.  A Real Estate Fair is Not a Form of Jewish Religious Observation.

The Government alleges that the land sale event was "a religious event centered on the Jewish obligation to live in the land of Israel, a tenet of the Jewish faith." *Id.* at 5. The Government does not cite a single passage from Jewish law stating that Jews have an "obligation to live in the land of Israel." And for good reason. No such obligation exists. Physically relocating oneself to the State of Israel is not a tenet of the Jewish faith (although some Jews have chosen to do so), any more than protesting in front of Planned Parenthood is a tenet of the Christian faith (even though some Christians have chosen to do so).

Living as an observant Jew is a life both driven and circumscribed by a detailed and complex skein of law. The Torah, the foundational document of Judaism, contains 613 commandments, both positive (you shall) and negative (you shall not) that govern almost all aspects of the life of an observant Jew. *See, e.g.*, *A List of the 613 Mitzvot (Commandments)*, Judaism 101 (last visited Feb. 19, 2026),  https://www.jewfaq.org/613_commandments. Not one of these commandments require Jews to live within the State of Israel, or to move within the boundaries of the ancient kingdom of Eretz Israel. There is, however, a prohibition on Jews moving

---

demonstrating a foreseeable risk of further violence and intimidation." Complaint at 19. Yet, there are no allegations Fry was involved in any way in the Bergenfield or Los Angeles protests.

to Egypt to reside. *See, e.g.*, Aryeh Citron, *The Prohibition Against Living in Egypt*, Chabad.org (last visited Feb. 19, 2026), https://www.chabad.org/library/article_cdo/aid/976660/jewish/The-Prohibition-Against-Living-in-Egypt.htm So, it is not as though issues of residency somehow escaped the attention of the deity who allegedly made and conveyed these laws.

While Torah law is immutable, there are literally libraries filled with interpretation of these commandments and Torah-derived commentary (Talmud) that continues to inform Jewish observation from about 70 A.D. to date. Many of the most orthodox Jews, who call themselves "Haredi," spend their entire lives studying this body of thought and attempting to make a contribution to it. The body of Jewish law is generally known as "halacha." *See, e.g.*, *Halakhah: Jewish Law*, Judaism 101 (last visited Feb. 19, 2026), https://www.jewfaq.org/jewish_law. There is nothing in halacha that contains an obligation to move to the State of Israel. That is the position of the pretty-much universally recognized halachic authority of the 20th century, Rabbi Moshe Feinstein. *See, e.g.*, My Jewish Learning (last visited Feb. 19, 2026), https://www.myjewishlearning.com/article/moshe-feinstein/. Rabbi Feinstein ruled that there was no obligation for Jews to relocate to Israel. *See, e.g.*, Rabbi Avi Zakutinsky, *The Mitzvah of Making Aliyah (Living in Israel) Today*, OU Torah (last visited Feb. 19, 2026), https://outorah.org/p/27212/.

This Court need not study halacha to come to this conclusion. The most salient and unassailable objective evidence of the absence of such a tenet is that hundreds of thousands of the most intensively religious Orthodox Jews living around the world don't regard it as incumbent on them to move to Israel. The Government's allegations, if accepted by this Court, would inform such Jews that they are in violation of their obligation as Jews.

That Jews should colonize the land formerly known as Palestine, and move to the present-day State of Israel, *is* a fundamental tenet of the *political* movement known as Zionism. This political movement originated in the late 19th century, was supported by the British government, which had control of Palestine after the end of WWI, and realized in 1948 in the aftermath of the Holocaust. The movement's central tenant is that there is a distinct "Jewish people," as opposed to people around the world who practice Jewish religious faith, and that this people are entitled to self-determination in their own "homeland," which today is the State of Israel. *See, e.g.*, Liora Halperin, *Origins and Evolution of Zionism*, Foreign Policy Research Institute (Jan 9. 2015), https://www.fpri.org/article/2015/01/origins-and-evolution-of-zionism/. While certainly many people who identify as Jewish support the existence of the State of Israel, relocating there is a not a tenet of Jewish faith.

Finally, even if this Court accepts as a "fact" the Government's unadorned, unsupported, and unsupportable opinion that relocating to the State of Israel is a Jewish obligation,[10] that does not make an Israeli land-sale event a form of religious observation. It is at least one step removed—that it could help facilitate Jewish emigration to Israel does not transform its fundamentally commercial nature. For example, Observant Jews who keep a kosher home have two entirely separate sets of china and cooking utensils for meat and for milk. This is in keeping with the thrice-repeated prohibition in the Torah against cooking a calf in its mother's milk. *See, e.g.*, Dr. Rabbi Zev Farber, *Prohibition of Meat and Milk: Its Origins in the Text*, TheTorah.com (last visited Feb. 19, 2026), https://www.thetorah.com/article/prohibition-of-meat-and-milk-its-origins-in-the-text. Should Glick choose to host a sale of "dishware, utensils, and cookware" in his home, this would

---

[10] While in the first *Codepink* decision the district court did accept this as a "fact" for 12(b)(6) purposes, it did so with substantially more support in the pleadings than are present here. *See Codepink*, 2025 WL 3030582, at *1 n.2.

not be a form of religious observation. Nor would changing the venue to a synagogue transform it into a religious event.

By baselessly insisting that the buying and selling of land, especially the land belonging to Palestinians, is a form of Jewish religious observation, the Government gives voice to one of the oldest, and possibly the oldest, anti-Semitic trope—that Jews, so consumed with money, will even do business in their own synagogues and call it worship. That trope was first committed to writing in all four Gospels, referencing the account of Jesus using physical violence to drive the merchants and money-changers from the Jerusalem Temple. Matthew 21:12–17, Mark 11:15–19, Luke 19:45–48, & John 2:13–16, Bible Gateway (last visited Feb. 19, 2026), https://www.biblegateway.com/passage/?search=Matthew+21%3A12-17,Mark+11%3A15-19,Luke+19%3A45-48,John+2%3A13-16&version=NRSVUE. Indeed, it is the only time in the Gospels where Jesus used violence against anyone. For some two millennia, it has been used to persecute and disparage Jews. The Government's claimed efforts to fight anti-Semitism risk enshrining this bigotry into American law.

## F. The Complaint Fails to State an Injury That is Fairly Traceable to the Defendant, Violating Fed. R. Civ. P. 12(b)(1).

Federal courts have limited jurisdiction, *see*, Art. III, U.S. Const., and plaintiffs must prove their case lies within a court's jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377-78 (1994). Plaintiff must establish they have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Plaintiff "bears the burden of establishing these elements" and "at the pleading stage, [they] must clearly allege facts demonstrating each element." *Id*. (citation omitted). The injury pled must "be fairly traceable to the challenged action of the defendant, and not the result of the independent

19

action of some third party not before the court." *Lujan*, 504 U.S. at 560-61 (citation omitted). Further, "the line of causation between the [alleged] illegal conduct and injury" must not be "too attenuated." *Allen v. Wright*, 468 U.S. 737, 752 (1984) (concluding that a weak demonstration of causation precludes Article III standing), overruled on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S. Ct. 1377, 1388 (2014). Since the line of causation must be more than attenuated, "where the causal chain involves third parties whose numerous independent decisions collectively have a significant effect on plaintiffs' injuries . . . the causal chain [is] too weak to support standing at the pleading stage." (Citations and internal quotation marks omitted). *Native Village of Kivalina v. Exxon Mobil Corp*., 696 F.3d 849, 867 (9th Cir. 2012). Courts are reluctant to endorse standing theories that rest on speculation about the decisions of an independent actor. *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 414 (2013).

Here, even accepting the pled injuries as true, they are not fairly traceable to Fry's alleged conduct. Based on the Government's pleadings, Glick moved the real estate sale from his home to the synagogue because of the delivery of a "threatening letter," the contents of which were not Fry's, and he interpreted a threat of force because of plead context that is unrelated and irrelevant to Fry. The complete lack of specificity and few facts around her conduct at the protest make it impossible for her actions to be fairly traceable such that statutory compensatory damages could be sought for the unnamed and unspecified number of people "aggrieved by Defendants' violations, including those who were intimidated or prevented from attending the religious event on November 13, 2024[.]" Complaint at 20.

## VI.    FRY RESPECTFULLY RESERVES THE RIGHT TO JOIN IN THE MOTIONS FILED BY ANY CO-DEFENDANT TO THE EXTENT THEY APPLY

To the extent that Fry's co-defendants' file motions to dismiss the Complaint, raising other relevant arguments, Fry respectfully reserves the right to join in those arguments.

VII.    **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed.


Dated: February 19, 2026

                                        Respectfully submitted,

                                        s/ Julie Fry
                                        Attorney for Defendant Tova Fry
                                        27 Lessing Rd
                                        West Orange, NJ 07052
                                        (646) 338-9148

                                        s/ Ronald L. Kuby
                                        Attorney for Defendant Tova Fry
                                        Admitted *pro hac vice*
                                        Law Office of Ronald L. Kuby
                                        119 West 23rd Street, Suite 900
                                        New York, NY 10011
                                        (917) 602-3992

                                        Of Counsel:
                                        Emma Vasta-Kuby
                                        Law Office of Ronald L. Kuby
                                        119 West 23rd Street, Suite 900
                                        New York, NY 10011
                                        (646) 238-7662