UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,         CIVIL ACTION NO. 2:25-CV-16049

       Plaintiff,

v.

TOVA FRY, ET AL.,

       Defendants.

**AMP-NJ'S MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS PURSUANT TO FED. R. CIV. PROC. 12(b)(6)**

Defendant American Muslims for Palestine New Jersey (AMP-NJ) hereby requests that the Court dismiss Plaintiff's claims against AMP-NJ for failure to state a claim, pursuant to Fed. R. Civ. Proc. 12(b)(6).[1]

**I.    PLAINTIFF'S CLAIM AGAINST AMP-NJ**

The allegations in Plaintiff's Complaint (Dkt 1) that mention American Muslims for Palestine – New Jersey (AMP-NJ) are, in their entirety, as follows:

    Page 3 –

    10.    Defendant AMP is the New Jersey chapter of American Muslims for Palestine, a national nonprofit organization that organizes anti-Israel protests and events. AMP's national organization has a history of targeting Jewish institutions, including a violent protest in June 2024 outside Adas Torah Synagogue in Los Angeles. On November 13, 2024, AMP . . . organized and promoted the violent protest at Congregation Ohr Torah.

    Page 6 –

    20.    On or around November 4, 2024, Defendant Tova Fry, a/k/a Terry Kay, was recorded on a Ring camera delivering a threatening letter to Glick's home, signed by AMP and other anti-Israel organizations, demanding cancellation of the event or threatening legal action, stating, in part, to "immediately terminate any and all hosting,

---

[1] In the interests of judicial efficiency, rather than restating the bulk of the other Defendants' arguments, Defendant AMP-NJ hereby adopts and joins in the motions to dismiss filed by the other Defendants.

1

participation, support, facilitation, and conspiracy to support such events."

Page 7 –

23. Glick discovered social media posts on pro-Palestinian social media accounts publicizing his home address as the location of a planned protest. He perceived this as a credible threat, given a pattern of similar incidents -- including a violent protest organized by AMP's national organization and others outside Adas Torah Synagogue in Los Angeles in June 2024.

24. Glick relayed the threatening letter to his private security team, who discovered that Defendant[] . . . AMP [was] posting on social media, calling for supporters to gather on November 13, 2024, near Glick's home to protest the event. The solicitation for protestors was distributed via interstate commerce through social media platform, Instagram. And, in another social media post, AMP urged protestors to hide their identities with masks.

25. As Image 2 shows, AMP's posts embedded the below flyer from a Jewish organization advertising eight cross-country events in November, circling both Glick's event and another event in Bergenfield, New Jersey, scheduled for November 7, 2024:



Image 2: Screenshots of AMP social media posts

26. On November 7, 2024, AMP and others organized a violent protest that disrupted the Bergenfield event.

Page 17

67. Defendant[] . . . AMP, as organizers, have a history of participating in disruptive and violent demonstrations targeting Jewish institutions, including, upon information and belief, the protest on November 7, 2024, in Bergenfield, New Jersey, demonstrating a pattern of conduct aimed at intimidating Jewish worshipers.

The actual legal claim against AMP is, in its entirety, as follows:

CAUSE OF ACTION:

VIOLATION OF THE FREEDOM OF ACCESS
TO CLINIC ENTRANCES ACT (18 U.S.C. § 248)

\* \* \*

71. . . . AMP promoted the November 13, 2024, protest, knowing it would foreseeably lead to violence and intimidation, like the November 7th Bergenfield protest a week prior. By urging supporters to mask their identities and target the event, . . . AMP [is] responsible for the resulting violations.

Dkt 1 at 17-18.

The relief requested against all defendants is as follows:

PRAYER FOR RELIEF

WHEREFORE, the United States, pursuant to 18 U.S.C. § 248(c), respectfully requests judgment in its favor and against Defendants PSL New Jersey, AMP New Jersey, Tova Fry a/k/a Terry Kay, Altaf Sharif, Matt Dragon, Eric Camins, Jane Doe, and John Doe, in the form of:

A. A permanent injunction prohibiting Defendants, their representatives, agents, employees, or any others acting in concert or participation with them, from:

B. Using force, threats of force, or physical obstruction to intentionally injure, intimidate, or interfere with or attempt to injure, intimidate, or interfere with any person lawfully exercising or seeking to exercise their First Amendment right to religious freedom at Congregation Ohr Torah or any other place of religious worship in the District of New Jersey, in violation of 18 U.S.C. § 248(a)(2);

C. Coming within a buffer zone directly outside Congregation Ohr Torah's

3

main entrance, comprising an area approximately 50 feet by 50 feet, extending from the synagogue's property line to the adjacent sidewalk and curb, or entering onto Congregation Ohr Torah's property;

  D. Coming within a buffer zone directly outside Dr. Moshe Glick's residence, comprising an area approximately 50 feet by 50 feet, extending from his property line to the adjacent sidewalk and curb;

  E. Organizing, participating in, or promoting any demonstration within 500 feet of Congregation Ohr Torah or any other place of religious worship in the District of New Jersey during religious services or events, without a valid permit, where such demonstration is intended to disrupt or intimidate worshipers;

  F. Statutory compensatory damages for each person aggrieved by Defendants' violations, including those who were intimidated or prevented from attending the religious event on November 13, 2024, pursuant to 18 U.S.C. § 248(c)(2)(B);

  G. A civil penalty assessment against each Defendant in the amount of $31,670 for the first violation of the FACE Act, and $52,786 for each subsequent violation, pursuant to 18 U.S.C. § 248(c)(2)(B)(i) and 28 C.F.R. § 85.5;

  H. An order authorizing the United States Marshal Service to use reasonable means to execute the Court's order and to arrest any person who impedes its execution;

  I. An order authorizing federal, state, or local law enforcement agencies to enforce the permanent injunction against Defendants and any others acting in concert or participation with them;

  J. An order for such additional relief as the interests of justice may require.

Dkt 1 at 19-21.

## II. THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF

The Complaint is not plausibly pled under the *Twombly* and *Iqbal* standards. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

### A. *Twombly/Iqbal* Standard

In particular, courts are reluctant to endorse causation theories that rest on speculation about the decisions of an independent actor. *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 414 (2013); *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).

4

A claim is facially plausible only when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). The allegations must be sufficient to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 548. This standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678. Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleading facts, plaintiffs have not demonstrated that they are entitled to relief, and the action must be dismissed. *Id*. at 679. *See also Connell v. Lane Const. Corp*, 809 F.3d 780 (3rd Cir. 2016) (assertions such as that the plaintiff was "sexually harassed" and including statutory language in place of facts will be disregarded); *Morse v. Lower Merion School District*, 132 F.3d 902, 906 n. 8 (3rd Cir. 1997) (bald assertions, unwarranted inferences, and legal conclusions cast in the form of factual averments must be disregarded).

> To determine the sufficiency of a complaint under the pleading regime established by those cases, a court must take three steps: First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Iqbal*, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id*.

*Santiago,* 629 F.3d at 130. The *Santiago* Court noted: "We also disregard 'naked assertions devoid of further factual enhancement' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.' *Iqbal*, 129 S. Ct. at 1949." *Id.* at 131.

### B. The Allegations Do Not Plausibly State a Claim For a "Threat" under the FACE Act

The elements of the statutory FACE Act claim require Plaintiff to plausibly (and non-

5

conclusorily) allege that Defendants:

> by force or threat of force or by physical obstruction, intentionally injure[d], intimidate[d] or interfere[d] with or attempt[ed] to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship.

18 U.S.C. 248(a)(2).

To be actionable under the FACE Act, a "threat of force" must be a "true threat." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1070, 1073(9th Cir. 2002), *as amended* (July 10, 2002) (citing *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 933 (1982)). Speech constitutes a "true threat" (and therefore not protected by the First Amendment) only when, "in the entire context and under all the circumstances, a reasonable person would foresee [it] would be interpreted by those to whom the statement is communicated as a serious expression of intent to inflict bodily harm upon that person." *Id.* at 1077.

About three years ago, the Supreme Court further clarified that, to constitute a "true threat," the government must also prove that the speaker *subjectively* understood their statement to be threatening, at a minimum showing recklessness. *Counterman v. Colorado*, 600 U.S. 66 (2023).

There is very little case law to date regarding FACE Act claims about religious freedom, but what cases exist support dismissal of this case. *See, e.g., Grand v. City of University Heights, Ohio*, 2024 WL 4403700, (N.D. Ohio 2024) (dismissing claim that defendant's threat to ticket a homeowner for violating housing code if he operated his home as "house of worship" without a permit was "threat of force" under the FACE Act).

Nothing in the complaint alleges or plausibly shows that Defendant AMP-NJ had the requisite subjective recklessness mental state to be liable under the FACE Act. The flyers

6

appended to paragraph 25 – the only specific factual assertion regarding AMP-NJ – do not constitute a "threat of force" (a "true threat" under First Amendment law); the land sale event could not plausibly be interpreted as an "exercise [of] the First Amendment right of religious freedom"; and Defendant AMP-NJ did not intentionally seek to interfere with a "religious" event.

        **C.**     **Plaintiff Does Not Plausibly Allege Causation Between AMP-NJ's Actions and Plaintiff's FACE Claim**

Even if a "true threat" were plausibly pled, the complaint fails to meet the *Twombly* and *Iqbal* standard for pleading causation. The attenuated causation allegations regarding AMP-NJ do not come close to the *Twombly/Iqbal* requirements. In *Santiago*, the Third Circuit dismissed a complaint about supervisory liability, based on *Twombly* and *Iqbal*. The situation is similar here, requiring the Court to carefully scrutinize the attenuated chain of causation so badly pled by Plaintiff in this case. The *Santiago* Court noted:

> Proximate causation is established where the supervisor gave directions that the supervisor "knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights." *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988); *see also Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990). Particularly after *Iqbal*, the connection between the supervisor's directions and the constitutional deprivation must be sufficient to "demonstrate a 'plausible nexus' or 'affirmative link' between the [directions] and the specific deprivation of constitutional rights at issue." *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (internal quotation marks and citation omitted). Therefore, to state her claim against Chief Murphy and Lt. Donnelly, Santiago needs to have pled facts plausibly demonstrating that they directed Alpha Team to conduct the operation in a manner that they "knew or should reasonably have known would cause [Alpha Team] to deprive [Santiago] of her constitutional rights." *Conner*, 847 F.2d at 397.

629 F.3d at 130.

The *Santiago* Court went on to analyze and apply the *Twombly* and *Iqbal* standards to the specific supervisory liability/causation allegations:

> Saying that Chief Murphy and Lt. Donnelly "specifically sought" to have happen what

7

allegedly happened does not alter the fundamentally conclusory character of the allegation.

      Our conclusion in this regard is dictated by the Supreme Court's decision in *Iqbal*. The plaintiff's claim in that case required proving that the defendants, Attorney General John Ashcroft and FBI Director Robert Mueller, had "adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group." 129 S. Ct. at 1951. The Court disregarded allegations that "petitioners knew of, condoned, and willfully and maliciously agreed to subject [respondent] to harsh conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin" and that "Ashcroft was the principal architect of this invidious policy, and that Mueller was instrumental in adopting and executing it." *Id*. (internal quotation marks omitted). The Supreme Court called those allegations "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim." *Id*. (internal quotation marks omitted). The Court emphasized that the claims required dismissal not because they were fanciful, but because they were conclusory. *Id*. Likewise, in this case where Santiago is required to prove that the Supervising Officers directed others to use excessive force, an allegation that the plan "specifically sought" that use of force is nothing more than a formulaic recitation of the elements of a supervisory liability claim and hence is not entitled to the assumption of truth. . . .

      In short, Santiago's allegations are "naked assertion[s]" that Chief Murphy and Lt. Donnelly directed Alpha Team to conduct the operation in the allegedly excessive manner that they did and that Lt. Springfield acquiesced in Alpha Team's acts. As mere restatements of the elements of her supervisory liability claims, they are not entitled to the assumption of truth.

*Id*. at 131-32.

Finally, the *Santiago* Court went on to address the plausibility requirement:

      "[P]ossibility" is no longer the touchstone for pleading sufficiency after *Twombly* and *Iqbal*. Plausibility is what matters. Allegations that are "merely consistent with a defendant's liability" or show the "mere possibility of misconduct" are not enough. *Iqbal*, 129 S. Ct. at 1949-50 (internal quotation marks omitted). Here, given the disparate treatment of the occupants of the home, one plausible explanation is that the officers simply used their own discretion in determining how to treat each occupant. In contrast with that "obvious alternative explanation" for the allegedly excessive use of force, the inference that the force was planned is not plausible. *Id*. at 1951-52 (quoting *Twombly*, 550 U.S. at 567, 127 S. Ct. 1955).

      Where, as here, an operation results in the use of allegedly excessive force against only one of several people, that use of force does not, by itself, give rise to a plausible claim for supervisory liability against those who planned the operation. To hold otherwise would allow a plaintiff to pursue a supervisory liability claim anytime a planned operation resulted in excessive force, merely by describing the force used and

8

appending the phrase "and the Chief told them to do it." *Iqbal* requires more.

*Id*. at 133.

As in *Santiago,* Plaintiff's complaint alleges merely conclusory allegations against AMP-NJ regarding causation. As quoted above, the actual legal claim against AMP-NJ is that it

> promoted the November 13, 2024, protest, knowing it would foreseeably lead to violence and intimidation, like the November 7th Bergenfield protest a week prior. By urging supporters to mask their identities and target the event, . . . AMP [is] responsible for the resulting violations.

Dkt 1 para. 71. "Promoting" a protest (with the flyers indicating no violence whatsoever) and "urging" masking (but again, without the flyers mentioning masking) – meet neither the specificity nor plausibility requirements of *Twombly* and *Iqbal,* as further clarified in the causation context by *Santiago*.

The "factual" allegations against AMP-NJ that precede the Claim for Relief are similarly conclusory, and also do not come close to meeting the elements of a FACE claim –

> That AMP-NJ has a history of "targeting" Jewish institutions and organizing protests, which the complaint (again conclusorily) labels as "violent" (Dkt 1 para. 10, 67);

> That AMP was one of the signers of a letter "demanding cancellation of the event or threatening legal action" (*id.* para. 20);

> That AMP posted the letter on social media, calling for protests, and urged protesters to wear masks (*id.* para. 24);

> That AMP embedded flyers in its social media – which speak for themselves and neither mention violence of any sort nor masking (*id.* para. 25);

> That AMP "organized" an earlier protest that the complaint asserts (again, conclusorily) was "violent" (*id*. para. 26).

The claim against AMP-NJ must be dismissed pursuant to *Twombly* and *Iqbal* for failure to state a claim for relief.

9

### III. PLAINTIFF'S CLAIM AGAINST AMP-NJ VIOLATES THE FIRST AMENDMENT

Plaintiff's complaint, on its face, requests relief that violates defendant AMP-NJ's First Amendment rights.

The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech." The Complaint asserts as evidence of interference, or intent to interfere, under the FACE Act, certain First Amendment-protected statements by Defendant AMP-NJ which fit into no articulable exception to the First Amendment.

For example, the flyers appended to paragraph 25 of the Complaint are clear calls for political protest. They do not include any language that could be remotely deemed a "true threat." Last year, the First Circuit, examining protest speech essentially similar to those on the flyers appended to paragraph 25, held:

> [M]ost of the conduct about which plaintiffs complain is speech protected by the First Amendment, and we do not construe Title VI as requiring a university to quash protected speech. Furthermore, by gathering together in groups on campus, disrupting campus tranquility, and impeding travel for many students, the protestors did not render their speech antisemitic, much less unprotected.

*StandWithUs Ctr. for Legal Just. v Massachusetts Inst. of Tech.,* 158 F.4th 1, 12 (1st Cir. 2025).

Defendant AMP-NJ has First Amendment freedoms, including the freedom of speech, association, "the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest." *Wyoming v. U.S. Dept. of Agric.*, 208 F.R.D. 449, 454 (D.D.C. 2002) (quoting *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 2 (D.D.C. 2002). Plaintiff's decision to sue AMP-NJ simply because of its social media postings appears designed only to "chill[] the free exercise of political speech and association guarded by the First Amendment." *Id*. at 454-55.

The Supreme Court has recognized that the right to freedom of association is closely

intertwined with freedom of speech, as well as the Due Process clause. The Court stated:

> Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. . . . It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.

*NAACP v. Alabama*, 357 U.S. 449, 460 (1958) (citations omitted). Thus, "[t]he First Amendment protects political association as well as political expression," *Buckley v. Valeo*, 424 U.S. 1, 15, 96 S. Ct. 612 (1976). *See also Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539 (1963) (citing *NAACP*; noting "the vital relationship between freedom to associate and privacy in one's associations").

The actions Plaintiff alleges AMP-NJ took were clearly protected by the First Amendment.

**CONCLUSION**

Based upon this brief, Defendant AMP-NJ respectfully requests that the Court dismiss the claim against AMP-NJ, for failure to state a claim.

        Respectfully submitted,
          s/ Saad Admani
        Saad Admani, Esq.
        Admani Law LLC
        101 Hudson Street, 21st Floor
        Jersey City, NJ 07302
        (201) 502-5243
        sadmani@admanilaw.com
        Of Attorneys for Defendant American Muslims for Palestine New Jersey