UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action No. 2:25-CV-16049 |
| Plaintiff, | |
| v. | **MOTION RETURN DATE:** |
| | **MARCH 16, 2026** |
| PARTY FOR SOCIALISM AND LIBERATION NEW JERSEY, AMERICAN MUSLIMS FOR PALESTINE NEW JERSEY, TOVA FRY a/k/a TERRY KAY, ALTAF SHARIF, MATT DRAGON, ERIC CAMINS, JANE DOE, and JOHN DOE, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MATT DRAGON'S MOTION TO DISMISS COMPLAINT --  Fed.R.Civ.Pro. 12(b)(6)**

1

# TABLE OF CONTENTS

Introduction and Summary of Facts Alleged ......................................... 1

Standards of Review ................................................................. 7

  A. Rule 12(b)(6) Requires Facts Sufficient to
    Make a Claim Plausible . ……………………………………… 7

  B. The FACE Act ..................................................................... 8

Argument .............................................................................. 11

  I. Plaintiff Has Alleged No Facts That Plausibly Show
    That Dragon Violated the FACE Act ...................... 11

  II. Dragon's Presence at an Energetic and
    Loud Demonstration Is the Very Speech the FACE Act's
    Authors Knew Must Be Protected................................................. 14

  III. This Court Lacks Jurisdiction to Shield and Facilitate the
    Commission of War Crimes in Violation of International Law
    as Plaintiff Requests ................................................... . 16

    A. MHI's Real Estate Sales Events Aid and Abet
      Violations of International Law ....................................... . 16

    B. The United States Is Party to the Fourth
      Geneva Convention Prohibiting Confiscating Land
      and Forcibly Transferring Populations.............................. 17

    C. Israel's Annexation, Confiscation, and Settlement
      Practices Constitute Crimes Against Humanity
      and War Crimes .............................................................. 18

Conclusion ......................................................................... 19

## TABLE OF AUTHORITIES

Allentown Women's Ctr., Inc. v. Sulpizio, 403 F. Supp. 3d 461
(E.D. Pa. 2019) ........................................................................ 13, 15

Ashcroft v. Iqbal, 556 U.S. 662.  (2009) ……............................................. 8, 20

Bell Atl. Corp. v. Twombly, 550 U.S. 544 127 S. Ct. 1955,
167 L.Ed.2d 868 (2009) .......................................,,,,,,,.............................8, 20

Bruni v. City of Pittsburgh, 824 F.3d 353 (3d Cir. 2016) ......... ………........2

Connelly v. Lane Constr. Co., 809 F.3d 780, (3d Cir. 2016) ... ……..…......8

Counterman v. Colorado, 600 U.S. 66, (2023) ............................................15

DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008) ……….....................14

Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc., 602 F.3d 237
(3d Cir. 2010) ............................................................................7

Kindschy v. Aish, 412 Wis. 2d 319 (Sup. Ct Wis. 2024) ……....................15

Lotierzo v. A Woman's World Med. Ctr., 278 F.3d 1180
(11th Cir. 2002) ...........................................................................10

Lutz v. Portfolio Recovery Assocs., LLC, 49 F.4th 323
(3d Cir. 2022) .............................................................................8

New Beginnings Ministries v. George, 2018 WL 11378829,*15
(S.D.O.H. 2018) ........................................................................ 10

United States v. Stevens, 533 F.3d 218, (3d Cir. 2008) …………………... 2, 14

United States v. Zavrel, 384 F.3d 130 (3d Cir. 2004) ................................ 15

Ward v. Rock Against Racism, 491 U.S. 781, 109 S. Ct. 2746,
105 L. Ed. 2d 661  (1989) ..............................................................2

## Statutes

18 U.S.C. § 248(a)(2) ................................................................. 10, 14

18 U.S.C. § 248(c)(1)(A) ............................................................. 10

18 U.S.C. § 248(a)(2) ................................................................. 11, 12

## Rules

Fed. R. Civ. P. 12(b)(6) .............................................................. 1, 7

## Legislative Materials

H.R. Rep. No. 103-488,9 (1994) (Conf. Rep.) ............................... 9, 12

103 Cong. Rec. 8883–8886 (daily ed. May 2, 1994) ...................... 9

CR. 29360–61 (Nov. 16, 1993) ..................................................... 10

139 Cong. Rec. S15660,1993 WL 470962 (Nov. 3, 1993) .............14

## Secondary Sources - Other Authorities

Arianne K. Tepper, *In Your F.A.C.E.: Federal Enforcement of the Freedom of Access to Clinic Entrances Act of 1993*,
17 Pace L. Rev. 489 (1997) ......................................................... 9

Fourth Geneva Convention ............................................................17, 18

1907 Hague Regulations IV .......................................................... 18
ICRC Customary International Humanitarian Law Database,
Rule 130 ……………………………………………………………….. . .18–19

U.N. Convention on the Suppression and Punishment of the
Crime of Apartheid (1973) .......................................................... 19

Defendant Matthew Dragon respectfully moves to dismiss the Complaint (Dkt. 1) in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). Dragon joins in the arguments of his codefendants to the extent they are not inconsistent with his own, and states as follows:

## INTRODUCTION AND SUMMARY OF FACTS ALLEGED

In its complaint Plaintiff makes the conclusory allegation that Dragon "led a mob that broke through a police line, defied lawful orders to stop, and marched onto synagogue property with intent to intimidate and obstruct Jewish worshipers, preventing access to the religious event at the Congregation Ohr Torah Synagogue." [Dkt. 1, ¶ 72].   Other than invoking the word "led" four times without any description of any act, [¶¶ 13, 40, 65 72] the only other allegation is that Dragon told another demonstrator that "the synagogue was the next building over."  [¶ 37].

Repeating the word "led" makes it no less conclusory. No facts are pled that Dragon had any formal or informal authority, that he had a bullhorn or some other means of command, or what he said or did to "lead" the protest. This flaw alone dooms the complaint.  But there are more.  The complaint is silent about what Dragon, individually did.   There are no facts alleging that he obstructed or intimidated anyone.  Nor are there facts evidencing Dragon's intent.

Plaintiff is suing under a statute that is uniquely respectful of First Amendment's protections for protestors' expressive conduct. (18 U.S.C. §248(d)(1). Plaintiff's failure to show that Dragon himself did anything outside the ambit of those protections makes this suit even more troublesome.

The Complaint relies extensively on generalized assertions and conclusory restatements of the elements of the pled causes of action and ignores the statutory definitions of "interfere with", "intimidate", and "physical obstruction" to ensure that this law would not be misused to stifle political dissent. All of Dragon's alleged conduct is protected by the First Amendment. Demonstrations, marches, and picketing are undeniably protected First Amendment activities. Bruni v. City of Pittsburgh 824 F.3d 353, 366-367 (3d Cir. 2016). The FACE Act specifically prohibits liability based on protected free speech activity. Even where protected First Amendment speech becomes 'intertwined' with illegal conduct, the solution is to punish the conduct not the speech. United States v. Stevens, 533 F.3d 218, 229-230 (3d Cir. 2008). Even if Plaintiff's implausible claim that Dragon "led" the demonstration is credited, where claims are based entirely upon his protected speech, the complaint must be dismissed.

There can be no debate that the Plaintiff has abandoned the cardinal principal of regulating speech – that the regulation be content neutral. (Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)). On January

24, 2025 the Acting Associate Attorney General decreed that "[T]o ensure that federal law enforcement and prosecutorial resources are devoted to the most serious violations of federal law, **future abortion-related FACE Act prosecutions** and civil actions will be permitted only in extraordinary circumstances, or in cases presenting significant aggravating factors, such as death, serious bodily harm, or serious property damage. Cases not presenting significant aggravating factors can adequately be addressed under state or local law." (Emphasis added.).  The Plaintiff has gone on record as stating that the standard for protecting "abortion-related" facilities is entirely different from the standard for protecting religious institutions.



U. S. Department of Justice

Office of the Associate Attorney General

Washington, D.C. 20530

January 24, 2025

MEMORANDUM FOR KATHLEEN WOLFE, SUPERVISORY OFFICIAL OF THE CIVIL RIGHTS DIVISION

FROM:    THE CHIEF OF STAFF TO THE ATTORNEY GENERAL  *CдM*
         (Exercising the Authority of the Acting Associate Attorney General)

SUBJECT:    FACE ACT CHARGING POLICY

President Trump campaigned on the promise of ending the weaponization of the federal government and has recently directed all federal departments and agencies to identify and correct the past weaponization of law enforcement.

To many Americans, prosecutions and civil actions under the Freedom of Access to Clinic Entrances Act ("FACE Act") have been the prototypical example of this weaponization. And for good reason. Even though more than 100 crisis pregnancy centers, pro-life organizations, and churches were attacked in the immediate aftermath of the *Dobbs* decision, nearly all prosecutions under the FACE Act have been against pro-life protesters. That is not the even-handed administration of justice.

To address this concern and to ensure that federal law enforcement and prosecutorial resources are devoted to the most serious violations of federal law, future abortion-related FACE Act prosecutions and civil actions will be permitted only in extraordinary circumstances, or in cases presenting significant aggravating factors, such as death, serious bodily harm, or serious property damage. Cases not presenting significant aggravating factors can adequately be addressed under state or local law. Additionally, until further notice, no new abortion-related FACE Act actions—criminal or civil—will be permitted without authorization from the Assistant Attorney General for the Civil Rights Division.

In light of these enforcement priorities, I direct you to immediately dismiss, with prejudice, the following FACE Act cases:

- *United States v. Connolly*, No. 2:24-cv-04467 (E.D. Penn.).
- *United States v. Zastrow, et al.*, No. 2:24-cv-00576 (M.D. Fla.).
- *United States v. Citizens for a Pro-Life Society, et al.*, No. 1:24-cv-00893 (N.D. Ohio).

If needed, further case-specific guidance will follow for cases in which a criminal conviction has already been obtained but in which a sentence has not yet been imposed, or in which the appeals are not yet completed, that did not present significant aggravating factors.

The relevant facts in this case are that a real estate company held a series of sale events in New York and New Jersey, including in the event in West Orange. The advertising offered land in illegal, Jewish-only settlements in Occupied Palestine. International law directly forbids the transfer of an occupying country's civilian population into the occupied territory under the Geneva Convention, and this event was correctly understood by many to be aiding and abetting the commission of that crime. Such events have been protested throughout the country and accused of aiding and abetting apartheid and genocide, and the MHI event in Los Angeles was no different.



The illegal sales in the West Bank are restricted to Jewish residents and owners, and the homes offered at this event are subject to these same apartheid racial restrictions. In fact, this company MHI is being investigated by the New Jersey Division on Civil Rights for possible "discrimination on the basis of race, religion, ancestry, national origin and other protected characteristics" during the company's previous real estate events.[1]  (Although MHI remained anonymous in this ad, "gborvick" is Gordon AKA "Gedaliah" Borvick, the company's founder.  *See* https://www.myisraelhome.com/about-5.

> "In early November 2024, Moshe [Glick] was approached by Gedaliah Borvick, an American *oleh* and expert in Israeli real estate, about hosting an informational event about buying property in Israel. Borvick was running a series of similar programs around the Tristate area, at which attendees could meet a team of real estate professionals to learn about the options and process of buying a home in Israel. One was scheduled for nearby Bergenfield, and the Glicks readily agreed to host another one at their home in West Orange, scheduling it for November 13."

https://mishpacha.com/face-off/ (last visited February 19, 2026).

---

[1] [1] Arvind Dilawar, "Organizers of Israeli Real Estate Event in LA Under Investigation in New Jersey," September 4, 2024 (last accessed October 22, 2025) <https://lapublicpress.org/2024/09/israeli-real-estate-fair-housing-investigation/>.

The Complaint alleges that, after learning of the notorious company's plan to host another discriminatory real estate sale event, this time in West Orange, Defendants called for their supporters to protest against the event, which was originally scheduled to be at a private home, and was only switched to a temple at the last minute. [¶ 1].

Plaintiff's abandonment of the constitutional requirement of content neutrality is the probable explanation for its insistence that at least one demonstrator intended violence [¶¶ 47-49] despite Glick's Grand Jury testimony –the transcript of which he publicly filed in another case in this District -- that there had been no violence until a counter-protestor sprayed a pro-Palestine demonstrator in the eyes with a chemical with a chemical weapon:

THE WITNESS: No. There was just lots of hate speech.

MR. TEISCH: But no one had assaulted anybody, nobody put their hands on anybody as far as you –

THE WITNESS: Not to my knowledge.

MR. TEISCH: And, again, you did not see Sharif being pepper sprayed, even though you had just been looking at him directly in the eyes, and going back and forth verbally with him, 1, 2, maybe two-and-a-half seconds earlier?

THE WITNESS: Yeah. I've answered that question. (Indiscernible). I said there was somebody blocking me. And the people were coming this way, so my eyes were more looking up the street. But, as I said, I didn't see it. I'm not sure that it would have mattered if I saw it or not. But, I did not see that.

Plaintiff never alleges that Defendant Matt Dragon was involved in any of these interactions.  Dragon is a Johns Hopkins-trained computer scientist, Dragon is an active community volunteer.  He is currently Deputy Director of West Orange's Community Emergency Response Team, helping to supervise and direct some thirty volunteers trained to assist the West Orange Fire Department and other first responders in emergencies.  Dragon also serves as a journalist for the award-winning news publication, Public Square Amplified, where he has written about electoral politics, police response to people with mental health crises, and the human toll of ICE's aggressive immigration enforcement.

He showed up at a demonstration the Plaintiff does not like. The Plaintiff never describes Dragon obstructing anyone or intimidating anyone.  It never produces a single fact supporting its claim that he intended to obstruct Jewish worshipers.

We ask that this case be dismissed.

## STANDARDS OF REVIEW

### A. Rule 12(b)(6) Requires Facts Sufficient to Make a Claim Plausible

Although a complaint need not contain detailed factual allegations . . . it must plead enough facts to state a claim to relief that is plausible on its face; Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 246 (3d Cir. 2010) A claim

is facially plausible only when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009) (internal quotation marks omitted). Conclusory allegations of law and unwarranted inferences are insufficient to avoid dismissal under this standard. Lutz v. Portfolio Recovery Assocs., LLC, 49 F.4th 323, 328 (3d Cir. 2022). A court may reject as implausible allegations that are too speculative to warrant further factual development. *Ibid.* The allegations must be enough to raise a right to relief above the speculative level. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 548, 127 S.Ct. 1955, 167 L.Ed.2d 868 (2009). The court need not accept allegations that are merely conclusory, are unwarranted deductions, or unreasonable inferences. Connelly v. Lane Constr. Co., 809 F.3d 780, 789-790 (3d Cir. 2016).  When the guesses, conclusory language, and innuendo are stripped away, what remains of Plaintiff's allegations that are grounded in specific facts is this: (1) Dragon was present at the demonstration; (2) He told another demonstrator that they were one building away from the synagogue.  From these crumbs, Plaintiff builds a mountain of surmise to insist that Dragon "led" the protest.  These are not facts sufficient to make a cognizable legal theory plausible. Lutz, 49 F.4th at 328.

## B. **The FACE Act**

The Freedom of Access to Clinic Entrances Act (FACE Act) was passed in 1994 when women's health clinics were being bombed and doctors who worked

there were being murdered. Congress received testimony and compiled findings describing a long pattern of clinic-directed violence and obstruction tactics—ranging from blockades and invasions to arsons, bombings, assaults, kidnappings, shootings, and murders—culminating in high-visibility killings and attacks around 1993–1994. Providers and clinic staff testified about threats and physical confrontations, and federal officials describing incidents across multiple states (used to show national scope).  Congress was concerned that the terror campaign would shrink the provider pool and close clinics, leading to delays in care and increased health risks. (Arianne K. Tepper, In Your F.A.C.E.: Federal Enforcement of the Freedom of Access to Clinic Entrances Act of 1993, 17 Pace L. Rev. 489 (1997).

Charles Schumer (who was then in the House of Representatives) carried the bill in the lower chamber and Sen. Kennedy led the effort in the Senate.  Congress was intent on making the law viewpoint-neutral and not "abortion-centric," so it shifted the protected interest from "abortion-related services" to "reproductive health services," and adding explicit savings/protection language for First Amendment–protected expressive activity. The whole thrust of the bill's First Amendment protections was to make it clear to the courts that the statute targeted force/ threat/obstruction), not protected speech.  (H.R. Rep. No. 103-488, (1994) (Conf. Rep.), reprinted in 103 Cong. Rec.8883-8886, (daily ed. May 2, 1994).)

A far lesser-known provision in the bill protects places of worship. Nothing in either the legislative hearings or the committee reports about the bill discusses houses of worship. Sen. Orrin Hatch, co-sponsor of the FACE Act in the Senate, got section (a)(2) added during Senate floor debate on Nov. 16, 1993. From the floor, Sen. Hatch referred to church burnings and gave several examples of religious services having been disrupted by demonstrators. CR 29360-61.

The law's "place of worship" cause of action has so seldom been invoked that caselaw interpreting the civil suit provision in 18 U.S.C. § 248(c)(1)(A) is scarce. Defendant could find no cases from the Third Circuit where such a suit has been brought. Other circuits, however, have identified four elements required to plead a violation of 18 U.S.C. § 248(a)(2): "Plaintiffs must demonstrate that Defendants used or attempted to use (1) force, threat of force, or physical obstruction; (2) with the intent to; (3) injure, intimidate, or interfere with a person; (4) because that person is exercising or is seeking to exercise his or her right of religious freedom at a place of religious worship." New Beginnings Ministries v. George, 2018 WL 11378829, *15 (S.D.O.H. 2018) (citing Lotierzo v. A Woman's World Med. Ctr., 278 F.3d 1180, 1182 (11th Cir. 2002) (citations omitted)).

# ARGUMENT

## I. **Plaintiff Has Alleged No Facts That Plausibly Show That Dragon Violated the FACE Act**

Plaintiffs must allege facts showing that Dragon:

[1]  Used force or the threat of force; **or**

[2]  By physical obstruction, intentionally injured, intimidated or interfered with; **or**

[3] By physical obstruction intentionally attempted to injure, intimidate, or interfere with;

[4] A person lawfully seeking to exercise or exercising the First Amendment right of religious freedom at a place of religious worship.

So Dragon must have either used force or threatened force, or through physical obstruction.  And he must have **intended**  to injure, intimidate, or interfere with them – or at least have intended to make that attempt.

Subsection (e) of the Act leaves little to chance.  We are taught that "physical obstruction" means to make ingress or egress either impossible or "unreasonably difficult or hazardous. {e)(4). *See also* S. Rep. 117, 103d Cong. 1st Sess. 31 (1993) (explaining that "physical obstruction" would include blockades, "chaining people

and cars to entrances with bicycle locks," strewing nails on public roads leading to clinics, and "blocking entrances with immobilized cars"); H.R. Conf. Rep No. 103-488, 9 (1994) (clarifying that physical obstruction would include, for example "physically blocking access to a church or pouring glue in the locks of a synagogue").

"Interference" means to restrict a person's freedom of movement. (e)(2) . "'Intimidate' means to place a person in reasonable apprehension of bodily harm to him- or herself or to another." ( e)(3).

So here are the paths to liability for Dragon, and the non-conclusory allegations supporting each of those paths:

| Element | Non-conclusory Factual Allegation |
|---|---|
| Force or threat of force | None |
| Physical obstruction | No facts – purely conclusory |
| Intentional injury, intimidation, or restricting someone's movement? (Interference) | None |
| Intentional attempt at Intentional injury, intimidation, or restricting someone's movement? (Interference) | None |

The actual facts alleged are that Dragon crossed a police line and told another demonstrator that they were one building down form the synagogue.

There is no force or threat of it.  There is no act of physical obstruction described.  Nor is there any intentionally caused or attempted injury, intimidation, or restriction of movement.  Force, along with threat of force and physical obstruction, is a necessary precedent to "intimidat[ing]" a person in violation of FACE . . ." Allentown Women's Ctr., Inc. v. Sulpizio, 403 F. Supp. 3d 461, 468 (E.D. Pa. 2019).

There remains only the word "led", which does a lot of work in this Complaint.  But its repeated invocation does not give it greater substance.  The allegation that Dragon "led" anyone remains a conclusion.  Did he have an armband? A bullhorn? Was he cajoling people and ordering them to proceed?

A sophisticated Plaintiff with sophisticated counsel knows how to use verbs instead of conclusions. The Complaint reflects as much: "Glick ran", "[o]ne worshiper grabbed", "Glick hit" [¶ 60].  The most Dragon did was pass through a police line (which apparently mattered little to the police, as there is no allegation that Dragon was arrested or even detained for this).

This is far too slender a reed to bear the weight of fines, penalties, attorneys' fees, and an injunction.

## II. **Dragon's Presence at an Energetic and Loud Demonstration is the Very Speech the FACE Act's Authors Knew Must be Protected.**

In its legislative history, 18 USC § 248(a)(2)'s sponsor stated the proposal would "do no more than give religious liberty the same protection that [the FACE Act] would give abortion," and would address recent violence, including a protest where activists entered a facility during prayer and threw things at the congregants, and a series of arson attacks against churches. 139 Cong. Rec. S15660, 1993 WL 470962 (Nov. 3, 1993).

A large outspoken demonstration (and counter-protestors with chemical weapons and club-like flashlights) bears little resemblance to the violent acts contemplated by the statute. Plaintiffs have not pled a single fact that could plausibly show that Dragon lifted a finger against the many people who attended the event he was protesting against.

Plaintiffs have also failed to plausibly allege that Dragon used a *threat* of force against them. The First Amendment protects offensive, harassing, and discriminatory speech DeJohn v. Temple Univ., 537 F.3d 301, 314  (3d Cir. 2008) and even speech that threatens to encourage criminality.  United States v. Stevens 224 (3d. Cir. 2008).  Where Plaintiffs rely on a "threat of force" to plead a violation of the FACE Act, they must show that the threat was a "true threat." 290 F.3d 1073 (providing that "FACE on its face requires that 'threat of force' be defined and

applied consistent with the First Amendment").

Under the Supreme Court's true threat doctrine, Defendant's speech was not a "threat" as speech only qualifies as a "true threat" where "in the entire context and under all the circumstances, a reasonable person would foresee [it] would be interpreted by those to whom the statement is communicated as a serious expression of intent to inflict bodily harm upon that person." *Id.* at 1077. The Supreme Court recently recognized a recklessness *scienter* requirement for culpable true threats, such that the Defendant must have "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Counterman v. Colorado, 600 U.S. 66, 69 (2023). Although Counterman arose in the context of a criminal charge, the *scienter* requirement that it recognized has also been applied to civil causes of action based on threats. *Id.*, at 80-81. *See, e.g.*, Kindschy v. Aish, 412 Wis.2d 319, 333 (Sup. Ct. Wis. 2024) (directly applying Counterman's *scienter* rule to a civil dispute.)

In this case, Plaintiff does not plausibly allege that Dragon, or indeed, any other Defendant issued a threat that was a serious expression of an intent to inflict bodily harm". Allentown Women's Ctr., *supra*, 469-470, quoting United States v. Zavrel, 384 F.3d 130, 138 (3d Cir. 2004). Plaintiff has not alleged facts showing that anyone, *especially* Dragon, expressed a serious expression of intent to inflict bodily harm. So, there is no effective allegation of a threat of force.

### III.    This Court Lacks Jurisdiction to Shield and Facilitate the Commission of War Crimes in Violation of International Law, as Plaintiff Requests

This Court may take judicial notice that all nations are subject to international humanitarian law (the law of war/armed conflict) and human rights law, and particularly to customary international law regardless of their signatory status. U.N. member states including the U.S. are bound to abide by and refrain from aiding and abetting violations of these international principles.[2] This includes an obligation not to permit misusing its legal system to shield the wrongful act.[3]

### A. MHI's Real Estate Sales Events Aid and Abet Violations of International Law

When Defendants labelled the MHI real estate sale an international war crime, this was not hyperbole, but invoked established international law principles. As the International Court of Justice ruled in 2024, Israel's occupation of Gaza and the West Bank, along with the associated settlement regime, annexation, and use of natural resources, is unlawful.[4] This Court can take judicial notice that at the time of the

---

[2] United Nations Charter, Art. 1(1)-(3), https://tinyurl.com/5n7fdwvc.

[3] International Law Commission, *Articles on State Responsibility, Art. 16*, available at https://tinyurl.com/53d6p6f8.

[4] United Nations, OHCHR, Press Release, "Experts hail ICJ declaration on illegality of Israel's presence in the occupied Palestinian territory as 'historic' for

protest in question, MHI listed real estate for sale in several areas of the occupied West Bank, including in the illegal, Jewish-only settlements.[5]

**B.**  **The United States is Party to the Fourth Geneva Convention Prohibiting Confiscating Land and Forcibly Transferring Populations**

The Fourth Geneva Convention, to which the U.S. is a party, prohibits forcibly confiscating or annexing land or transferring populations into and out of the territory.[6] The Geneva Conventions and the Hague Regulations are customary international law and thus universally binding.[7] Plaintiff demands that this Court obstruct accountability for violations of the Geneva Conventions. He would have

---

Palestinians and international law," July 30, 2024, available at https://tinyurl.com/4bptuzka.

[5] Nevin Kallepalli, "The Disastrous 'Great Israeli Real Estate Event'," Curbed (March 18, 2024). <https://www.curbed.com/article/the-disastrous-great-israeli-real-estate-event.html>. Although the MHI website now appears to have removed the specific listings in the illegal settlements, the listings are viewable through online internet archives such as Wayback Machine, and were still on the website in June 2024.

[6] The Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, 1949, Art. 47, available at https://tinyurl.com/2aa2ujy6; Id. at Art. 49, available at https://tinyurl.com/32htsmyz; Id. at Art. 147, available at https://tinyurl.com/3xt43az6.

[7] International Committee of the Red Cross ("ICRC"), *Customary International Humanitarian Law*, available at https://tinyurl.com/k2at4v4c.

this Court abrogate the United States' obligations as a High Contracting Party per Common Article 1.[8]

## C. Israel's Annexation, Confiscation, and Settlement Practices Constitute Crimes Against Humanity and War Crimes

Israel's settlement practice constitutes a war crime and a crime against humanity, violating international humanitarian law principles prohibiting establishing settlements in occupied territories to confiscate occupied land.[9] The 1907 Hague Regulations IV, to which the U.S. is a party, prohibits land annexation and confiscating private property, and requires the occupying state to only administer and usufruct occupied territory to safeguard their capital.[10] Rule 130 of the ICRC's customary international law database provides that "[s]tates may not deport or transfer parts of their own civilian population into a territory they occupy," and this prohibition is binding customary international law.[11]

---

[8] The Fourth Geneva Convention, 1949, Art. 1, available at https://tinyurl.com/mttw42sh.

[9] ICRC, *Customary International Humanitarian Law*, available at https://tinyurl.com/k2at4v4c.

[10] 1907 Hague Regulations IV, Respecting the Laws and Customs of War on Land and its Annex: Regulations Concerning the Laws and Customs of War on Land, available at https://tinyurl.com/2hwzu7h5.

[11] ICRC, *International Humanitarian Law Database*, Rule 130, available at https://tinyurl.com/yay4rddd.

In addition to constituting war crimes and crimes against humanity under international humanitarian law, Israel's settlement regime also violates numerous international human rights law treaties.[12] The 1973 U.N. Convention on the Suppression and Punishment of the Crime of Apartheid deems Apartheid an entirely separate crime against humanity.[13] Israel's settlement project violates these long-standing customary international humanitarian and human rights law principles by forcibly transferring its occupying population to the Occupied Territories via its settlements, and by enforcing a regime of racial apartheid.

In conclusion, this Court cannot legally shield or facilitate violations of international law in such a way as to render itself culpable. As such an exercise of jurisdiction would be *ultra vires*, the Complaint must be dismissed.

## CONCLUSION

The Court has a gate-keeping function, even at the pleading stage. That function is perhaps most needed when political actors dress as litigants and demand that judges turn their courtrooms into stages for ideological or even theological

---

[12] The International Convention on the Elimination of All Forms of Racial Discrimination ("ICERD"), to which the U.S. is a party, Article 1 prohibits racial discrimination and condemns racial segregation and apartheid. ICERD, 1965, available at https://tinyurl.com/fjzy2c59.

[13] Convention on the Suppression and Punishment of the Crime of Apartheid, 1976, Art. 1, available at https://tinyurl.com/yc7kfj9x.

disputes. That is why <u>Iqbal</u> and <u>Twombly</u> demand that that rhetoric must be tethered to facts, and that grand theories be supported by enough of those facts to at least make the theories plausible.

Those guardrails have been entirely breached here. Several groups called for a demonstration. Dragon and his co-defendants had intended to be protesting a landgrab real estate event being held at a private home.  They had no idea that by marching to the sales event's a temple they would be accused of interfering with religious services on Wednesday night, a time not notable for Jewish religious gatherings. Yet in this hyperbolic atmosphere a constitutionally protected legal protest is recast as a campaign of terror.

The law requires more of a plaintiff than hyperbole. There must be at least a nod to the reality-based community–a latticework of facts that are more than dressed-up conclusions.  The Plaintiff has utterly failed at even this most basic requirement.  There are no facts showing Dragon attempted to obstruct religious services, no facts showing he intimidated, threatened, or restricted anyone.

Unless Plaintiff can articulate actual facts that would make credible and actual theory of liability, there should be no second bite at the apple, no further stage for a press conference spewing lies about these productive community members and their alleged motives.

This Complaint should be dismissed with prejudice.

Respectfully submitted,

Dated:  February 20, 2026          By:     /s/Renée Steinhagen
                                          Renee Steinhagen, Esq.
                                          NJ Appleseed PILC
                                          23 James Street
                                          Newark, NJ 07102
                                          973-735-0523
                                          renee@njappleseed.org

                                          Mark Kleiman, Esq.
                                          KLEIMAN / RAJARAM
                                          12121 Wilshire Blvd., Ste. 810
                                          Los Angeles, CA  90025
                                          Tel:  310-392-5455
                                          Fax: 310-306-8491
                                          Email:  mark@krlaw.us
                                          *(Admitted pro hac vice)*

                                          Attorneys for Defendant

                                          MATT DRAGON