# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Hon. Katharine S. Hayden, U.S.D.J. |
| Plaintiff, | Hon. José R. Almonte, U.S.M.J. |
| v. | |
| **PARTY FOR SOCIALISM AND LIBERATION NEW JERSEY**, **AMERICAN MUSLIMS FOR PALESTINE NEW JERSEY**, **TOVA FRY** a/k/a TERRY KAY, **ALTAF SHARIF**, **MATT DRAGON**, **ERIC CAMINS**, JANE DOE and JOHN DOE, | Civil Action No. 2:25-cv-16049 |
| Defendants. | |

---

## DEFENDANT ALTAF SHARIF'S MEMORANDUM OF LAW IN IN SUPPORT OF HIS RULE 12(b)(6) MOTION TO DISMISS

---

SUMNER LAW LLP
300 CARNEGIE CENTER DRIVE, SUITE 150
PRINCETON, NEW JERSEY 08540

RECHT KORNFELD, P.C.
90 BROAD STREET, SUITE 703
NEW YORK, NEW YORK 10004

*ATTORNEYS FOR ALTAF SHARIF*

*ON THE BRIEF:*
*SONYA M. SUMNER*
*DREW W. SUMNER*
*CHRISTOPHER P. BEALL*
*JEREMIAH RYGUS*

<u>Motion Return Date:</u>     March 16, 2026
Oral Argument Requested

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................... ii

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS ........................................................................... 2

ARGUMENT ............................................................................................ 9

   I.     Under Rule 12(b)6), Plaintiff's Complaint Must Allege Sufficient Non-Conclusory Facts That Are Not Contradicted By Its Own Incorporation of Uncontested Video to Establish a Plausible Theory of Liability Under the FACE Act.   9

   II.    Plaintiff Has Failed to Plausibly Allege Any Obstruction of a Religious Worship When the Demonstrators Never Reached the Synagogue's Access Points...........................................................................................17

   III.   Plaintiff Has Failed to Plausibly Allege that Sharif Interfered with Any Religious Worship When Sharif Never Approached the Synagogue. .................19

   IV.   Plaintiff Has Failed to Plausibly Allege that Sharif's Conduct During the Demonstration Was Not Protected First Amendment Expression. ......................20

   V.    Plaintiff's Allegations Related to Interference with the Planned Gathering at Mr. Glick's Residence Fail to State a Claim Under the FACE Act. ...............22

CONCLUSION ..........................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 9

*Baker v. City of Madison*,
  67 F.4th 1268 (11th Cir. 2023) ................................................................... 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2009) ................................................................................ 9, 13

*Bell v. City of Southfield*,
  37 F.4th 362 (6th Cir. 2022) ...................................................................... 12

*Bogie v. Rosenberg*,
  705 F.3d 603 (7th Cir. 2013) ...................................................................... 13

*Connelly v. Lane Constr. Corp.*,
  809 F.3d 780 (3d Cir. 2016) ......................................................................... 9

*Doriety v. Sletten*,
  109 F.4th 670 (4th Cir. 2024) ............................................................... 12, 13

*Esco v. City of Chicago*,
  107 F.4th 673 (7th Cir. 2024) ............................................................... 13, 14

*Feminist Majority Found. v. Hurley*,
  911 F.3d 674 (4th Cir. 2018) ...................................................................... 17

*Guimaraes v. Metal Transp., LLC*,
  790 F. Supp. 3d 389 (M.D. Pa. 2025) ....................................................... 11

*Harmon v. City of Arlington*,
  16 F.4th 1159 (5th Cir. 2021) ..................................................................... 12

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
  822 F.3d 125 (3d Cir. 2016) ....................................................................... 11

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ..................................................................... 10

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir.1993) ........................................................................... 10

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002) ................................................................... 10

*Jingrong v. Chinese Anti-Cult World Alliance Inc.*,
  16 F.4th 47, 59 (2d Cir. 2021) .................................................................. 23

*Kass v. City of New York*,
  864 F.3d 200 (2d Cir. 2017) ...................................................................... 13

*Kaynaroglu v. Avis Budget Grp., Inc.*,
  773 F. Supp. 3d 169 (D.N.J. 2025) ............................................................ 10

*Lead v. Cormedix Inc.*,
  797 F. Supp. 3d 381 (D.N.J. 2025) ............................................................ 10

*Livingston Christian Schs. v. Genoa Charter Twp.*,
  858 F.3d 996 (6th Cir. 2017) ..................................................................... 17

*McLaurin v. County of Erie*, No. 1:21-cv-00322 (SPB)(RAL),
  2022 U.S. Dist. LEXIS 81448 (W.D. Pa. May 4, 2022) ........................ 11-12

*New Beginnings Ministries v. George,* No. 2:15-cv-2781,
  2018 WL 11378829, 2018 U.S. Dist. LEXIS 245391 (S.D. Ohio Sept., 18, 2018)
  ....................................................................................................... 19, 20

*Pahls v. Thomas*,
  718 F.3d 1210 (10th Cir. 2013) ................................................................. 17

*Pension Benefit Guar. Corp. v. White Consol. Indus.*,
  998 F.2d 1192 (3d Cir. 1993) .................................................................... 10

*Pinkney v. Meadville Pa.*,
  No. 21-1051, 2022 U.S. App. LEXIS 13824, 2022 WL 1616972 (3d Cir. May 23,
  2022) ......................................................................................................... 11

*Romero v. City of Lansing*,
  159 F.4th 1002 (6th Cir. 2025) ..........................................................*passim*

*Saalim v. Walmart, Inc.*,
  97 F.4th 995 (6th Cir. 2024) ............................................................... 13, 14

*Schmidt v. Skolas*,
  770 F.3d 241 (3d Cir. 2014) ...............................................................................11

*Scott v. Harris*,
  550 U.S. 372 (2007) ...........................................................................................14

*Shaw v. Digit. Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996) ..............................................................................10

*Sondhi v. McPherson Oil Co.*,
  No. 20-13986, 2021 U.S. Dist. LEXIS 222302 (D.N.J. Nov. 17, 2021) .............17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...........................................................................................10

*Tesoro Ref. & Mktg. Co. LLC v. City of Long Beach*,
  334 F. Supp. 3d 1031 (C.D. Cal. 2017) ..............................................................17

*United States v. Perea-Rey*,
  680 F.3d 1179 (9th Cir. 2012) ............................................................................17

*Weems v. Curry*,
  No. 14-7575, 2014 U.S. Dist. LEXIS 171404 (D.N.J. Dec. 11, 2014) ...............17

**Statutes**

18 U.S.C. § 248 ...................................................................................17, 20, 21

**Rules**

Fed. R. Civ. P 12 ..................................................................................9, 10, 11

Fed. R. Civ .P 56 ................................................................................................10

## INTRODUCTION

On November 13, 2025, Altaf Sharif joined a group of law-abiding citizens who gathered to exercise their First Amendment rights, by staging a demonstration opposing what they believed to be a moral and political injustice. They gathered because another group of people, including Moshe Glick, were gathering to sell land from occupied Palestinian territory to Americans. That practice of selling stolen Palestinian land to Americans is what galvanized Mr. Sharif and the other demonstrators, not antisemitism, nor religious animus.

The demonstrators, a multicultural group including many who identify as Jewish, did not disrupt nor block access to a religious service. There were no religious services occurring at Congregation Ohr Torah that evening, and if there had been, the demonstration did not get close enough to the synagogue to interfere with them. Altaf Sharif joined a demonstration calling attention to a real estate auction. Holding a land sale in a synagogue does not convert a real estate auction into a religious gathering any more than holding a bingo night in a church basement converts fluorescent dabbers and plastic chips into liturgical objects and sacred vessels. Most importantly though, regardless of what the synagogue was being used for on the evening of November 13, 2025, the demonstrators never impeded access to it.

1

The events of that evening have been captured on hours of video footage. Between police body worn cameras, cellphone videos, and surveillance cameras, virtually every moment of the demonstration has been captured and preserved, from multiple angles. Mr. Sharif's defense has obtained all the footage from the Essex County Prosecutor's Office and is submitting all of it for the Court's inspection. *See* Decl. of Jeremiah Rygus ("Rygus Decl."), Exhibit "B," "C." Mr. Sharif does not expect the Court to view hours of footage, but there are key moments in the footage that clearly show many of the Government's alleged facts to be demonstrably false. To aid the Court, the defense has assembled a video, approximately ten minutes long, that depicts critical moments of the demonstration in chronological order. *See* Rygus Decl., Exh. "C." Those events, detailed below and corroborated by incontrovertible video footage, make clear that access to Congregation Ohr Torah was never blocked nor compromised.

## STATEMENT OF FACTS

The evening of November 13, 2025, demonstrators assembled near the home of Moshe Glick, where a land sale had been scheduled to occur. After learning that the sale had been moved to a nearby synagogue, Congregation Ohr Torah, the demonstrators, along with a police escort, began marching in that direction. As the demonstrators neared the vicinity of the synagogue, the police gave them instructions regarding how they would like the protest to proceed as they approached

2

it. The body worn camera footage of police officers on scene clearly depicts the demonstrators as compliant and cooperating with police instructions. Police officers can be clearly heard telling the demonstrators where they would like them to go, and where they would like them to avoid. *See* Rygus Decl., Exh. "C" at timestamp 0:08. Also clearly audible, is the cooperative response from the demonstrators. At timestamp 0:19, police let the demonstrators know that they can spread onto the grass if they would like. *See id.*

The Government disingenuously casts the interactions between the police and demonstrators as adversarial and contentious, making outlandish claims that are clearly disproved by the footage taken from the officers themselves. What the collective hours of footage shows is that the demonstrators, including Altaf Sharif, were cooperating and coordinating with the police escort, to ensure that the demonstration was lawful and peaceful.

In stark contrast, the behavior of the counter-protestors and other people the Government describes as "worshippers", was anything but compliant and peaceful. *See id.* At timestamp 0:27, police officers approached men who were unlawfully blocking a public sidewalk. *See id.* The men were wearing insignia that clearly distinguished them from the demonstrators, and they blocked the sidewalk ensuring that the demonstration did not in fact get near the synagogue. They succeeded.

Despite the inaccurate statements in the Government's Complaint, the police footage makes clear that the demonstrators never moved beyond that point.

The police informed the counter-protestors that they were not permitted to block a public sidewalk, and the demonstrators hung back and patiently waited in front of a firehouse on the corner. At timestamp 0:39, police officers asked the demonstrators to keep moving, as they were blocking access to the firehouse doors. *See id.* The demonstrators immediately responded to the police instructions and began moving on. Ironically, the only building entrance the demonstrators blocked was this firehouse, and they moved on as soon as asked.

The demonstrators complied with police instructions, and prepared to continue walking along the public sidewalk, in the direction of the large group amassing to block their way. As they did, the demonstrators engaged in a call and response where they chanted in unison that they were going to stay on the public sidewalk and not the road or the grass. *See id.* at timestamp 1:05. Again, despite the Government's patently untrue allegations, the demonstrators were doing everything they could to comply with requests from the police, even going to far as instructing their own group not to do anything to "irritate them." *See id.* at timestamp 1:15.

As directed by the police, the demonstrators continued their march down the public sidewalk. Shortly after moving beyond the firehouse, the demonstrators found their way blocked by the counter-protestors. *See id.* at timestamp 1:17. The police

specifically asked the counter-protestors not to block the public sidewalk, but it was the counter-protestors who refused to comply with the police request. As the two groups approached each other, the demonstrators stopped advancing and did not use or threaten physical force against the people blocking the lawful demonstration. Rather, they used bullhorns and plastic horns (vuvuzelas) to amplify their presence and assert their right to proceed along the public sidewalk without resorting to violence. The counter-protestors did not step aside. The path behind them leading past the entrance to the synagogue parking lot was wide open, but they did not even attempt to go there. The demonstrators, including Altaf Sharif, were exercising their First Amendment rights and complying with police requests, but the counter-protestors were determined in their resolve to shut the demonstration down.

At this point, Altaf Sharif, wearing a keffiyeh on his head and blowing a black horn, had assumed a position near the front of the group of demonstrators. On the other side, Moshe Glick, wearing a hood over his head and aggressively shining a flashlight in people's eyes, was positioned almost directly across from Mr. Sharif. The standoff continued, noisily, but not physically, until Moshe Glick took it upon himself to escalate the situation and make physical contact with one of the demonstrators. He swatted the horn of a female demonstrator standing next to Mr. Sharif and Mr. Sharif responded, not with physical force, but by turning and blowing his horn in Mr. Glick's direction. *See id.* at timestamp 1:45. Mr. Glick could have

5

walked away, right to the synagogue, as his access was not blocked by anyone, but he didn't. Instead, Mr. Glick resorted to physical violence again, this time grabbing Mr. Sharif's horn and tearing it from his mouth. Mr. Sharif took a few steps towards Mr. Glick, then backed up to his position amongst the demonstrators. At the same time, Solomon Silberberg, dressed in a black ski mask, gloves, and a black leather jacket, emerged from among the demonstrators and took a position at Mr. Sharif's side. *See id.* at timestamp 1:51. He had been with the demonstrators the entire time and was not a "worshiper" as characterized in the Government's complaint. At timestamp 0:50, the masked "worshiper", Mr. Silberberg, is clearly captured on police bodycam footage pretending to be one of the demonstrators. *See id.* After Moshe Glick escalated the situation and instigated a physical altercation with Mr. Sharif, Mr. Silberberg raised his hand and sprayed a chemical agent directly into Mr. Sharif's eyes. *See id.*

When Mr. Silberberg sprayed chemicals into Altaf Sharif's face, the demonstrators had been compliant with police requests and had not gone anywhere near the synagogue entrance. The only people from either side that had used any type of physical force or violence, were Moshe Glick and Solomon Silberberg. And any worshipers who wanted access to the synagogue had free and unrestricted access at either end of the property entrances far away from where the demonstrators had stopped, on the sidewalk just past the firehouse. The two sides were squaring off on

a public sidewalk, away from the synagogue entrance, shouting their ideas and opinions at each other. It was loud, and it was heated, but apart from the actions of Mr. Glick and Mr. Silberberg, it was exactly what the First Amendment was designed to protect.

After assaulting Mr. Sharif with a chemical weapon, Mr. Silberberg continued to stand right beside him, presumably with the weapon still in his hands or on his person. Mr. Sharif grabbed him and the two of them tumbled to the ground, rolling down a hill, and onto the back corner of a parking lot. *See id.* at timestamp 2:02. They tussle for a few moments, police officers arrive, and they are quickly separated and end up in the back corner of the back parking lot. At some point during the tussle, Mr. Glick assaulted Mr. Sharif with the flashlight he had been carrying, causing a large gash on the top of Mr. Sharif's head.

The video footage is clear. Mr. Sharif tumbled into that parking lot during a skirmish with Mr. Silberberg. He didn't enter the lot intentionally; he fell into it. There is a large building in middle of the lot, and the synagogue is on the opposite side of the building from Mr. Sharif. Multiple police officers were also there with their bodycams recording, and the footage is very clear: even at this point, none of the demonstrators approached the building that houses the synagogue. The entrance was not even in sight. The police ordered everyone back up the embankment and back to the sidewalk, and within a few minutes this ancillary altercation that Mr.

Glick and Mr. Silberberg had incited was over and everyone had returned up the slope to the sidewalk.

Shortly after everyone had returned to the sidewalk, the demonstrators decided to move across the street, away from the aggressive counter-protestors, and even farther away from the synagogue. *See id.* at timestamp 5:54. Around the same time, Mr. Glick asked a police officer what the police would like them to do and the officer responded by saying he would like the counter-protestors to move back a bit. *See id.* at timestamp 6:00. Mr. Glick responds by saying "so back to the entrance? Ok, we'll do that." Making it abundantly clear that neither group had been near the entrance to the synagogue the entire time. At timestamp 6:20, a voice is heard saying "Ok, he asked us to move, we're going back to the schul, we're going back to the synagogue" further evincing the fact that the demonstration was not in fact near the synagogue, despite what the government alleges in their Complaint. *See id.*

From that point on, the demonstrators remined on the opposite side of the street and continued to stay away from the entrance to the synagogue.

## ARGUMENT

I. **Under Rule 12(b)6), Plaintiff's Complaint Must Allege Sufficient Non-Conclusory Facts That Are Not Contradicted by Its Own Incorporation of Uncontested Video to Establish a Plausible Theory of Liability Under the FACE Act.**

Under Rule 12(b)(6), a claim may survive a motion to dismiss only when it plausibly "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (internal quotation marks omitted). The nonconclusory, plausible factual allegations in a complaint must be enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548, (2009). The Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678. "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

While, generally, the Court may not consider anything beyond the four corners of the complaint on a Rule 12(b)(6) motion, the Third Circuit has held that courts may consider any "document integral to or explicitly relied upon in the complaint" without converting the motion to one for summary judgment under Rule 56. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)); *see also Kaynaroglu v. Avis Budget Grp., Inc.*, 773 F. Supp. 3d 169, 179 (D.N.J. 2025) ("The Court also considers any document integral to or explicitly relied upon in the complaint." (quotation omitted)); *cf. In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.9 (3d Cir.1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." (citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993))).

In this District, courts frequently apply this principle to hold that extrinsic material that is selectively quoted or relied upon in a plaintiff's complaint may be presented in full and considered by the court on a Rule 12(b)(6) motion. *See, e.g., Lead v. Cormedix Inc.*, 797 F. Supp. 3d 381, 397 n.3 (D.N.J. 2025); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (holding that a trial court "must consider" documents "incorporated . . . by reference" and matters subject to judicial notice when considering a Rule 12(b)(6) motion); *In re NAHC,*

*Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002); *accord Pinkney v. Meadville Pa.*, No. 21-1051, 2022 U.S. App. LEXIS 13824, 2022 WL 1616972, at *2 (3d Cir. May 23, 2022) (A court may look beyond the pleadings and "consider document[s] integral to or explicitly relied upon in the complaint," or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016)).

The rationale for consideration of such material is that "it is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint[.]" *Guimaraes v. Metal Transp., LLC*, 790 F. Supp. 3d 389, 397 n.4 (M.D. Pa. 2025) (quoting *Schmidt v. Skolas*, 770 F.3d 241, 250 (3d Cir. 2014)). As the Third Circuit explained in *Schmidt*, a plaintiff should not "be able to evade accountability for such documents simply by not attaching them to his complaint." 770 F.3d at 250.

Courts within this Circuit and across the country have relied on this doctrine to consider, on a Rule 12(b)(6) motion, video footage that "blatantly contradicts" or "utterly discredits" the allegations in a plaintiff's complaint, thereby showing the plaintiff's factual contentions to be plainly false and the plaintiff's theory of liability implausible. For example, in *McLaurin v. County of Erie*, No. 1:21-cv-00322 (SPB)(RAL), 2022 U.S. Dist. LEXIS 81448 (W.D. Pa. May 4, 2022), the Court

11

noted that "when a video attached or referred to in a complaint 'clearly contradicts' the plaintiffs [*sic*] factual allegations, the video controls." *Id.* at *12 (citation omitted). Similarly, the Sixth Circuit in *Romero v. City of Lansing*, 159 F.4th 1002 (6th Cir. 2025), stated that courts may rely on video evidence at the 12(b)(6) stage when it "blatantly contradicts or utterly discredits the plaintiff's version of events." 159 F.4th at 1008 ("In cases of blatant contradiction, the videos render the complaint 'implausible.'"); *see also Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) ("[W]hen uncontroverted video evidence easily resolves a case, we honor qualified immunity's principles by considering the videos. Plus, the videos here are already in the record. Indeed, the plaintiff's complaint implicitly relies on the videos by recounting facts that could only be known to him by watching the videos. Thus, it makes little sense to waste time and effort by ignoring the videos' contents.").

The Fourth Circuit in *Doriety v. Sletten*, 109 F.4th 670 (4th Cir. 2024), held that a district court can consider video evidence at the motion-to-dismiss stage if the video is integral to the complaint, its authenticity is not challenged, and it clearly depicts facts contrary to those alleged in the complaint, making the allegations implausible. 109 F.4th at 679 ("We have not previously addressed in a published decision whether and in what manner a trial court may consider a video recording at the motion to dismiss stage. But we have explained that when a district court considers a video recording of a police encounter at the summary judgment stage, a

12

court must credit the plaintiff's version of the facts to the extent they are not 'blatantly contradicted' by the recording…. In agreement with our sister circuits, we now conclude that the same standard applies to a trial court's consideration of a video recording at the motion to dismiss stage." (citing *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021); *Baker v. City of Madison*, 67 F.4th 1268, 1277-78 (11th Cir. 2023); *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024) (judgment on the pleadings); *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (same)). Accordingly, "a district court can consider a video submitted at the motion to dismiss stage when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations, rendering the plaintiff's allegations implausible." *Doriety*, 109 F.4th at 679-80.

The Seventh Circuit in *Esco v. City of Chicago*, 107 F.4th 673 (7th Cir. 2024), also emphasized that when an exhibit, such as a video, incontrovertibly contradicts the allegations in the complaint, the exhibit controls, even at the motion-to-dismiss stage. 107 F.4th at 678-79 ("Although a district court, in a motion to dismiss, must take the plaintiff's well-pleaded facts as true, when an exhibit, including a video exhibit, 'incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.' *Bogie v. Rosenberg*,

705 F.3d 603, 609 (7th Cir. 2013). This is because to survive a motion to dismiss, the complaint must 'state a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint that contradicts uncontroverted video is not plausible.")

This principle aligns with the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007), which emphasized that courts should not adopt a plaintiff's version of facts when video evidence clearly contradicts it. *See* 550 U.S. at 380-81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *see also Romero*, 159 F.4th at 1008; *Esco*, 107 F.4th at 679; *Saalim*, 97 F.4th at 1002.

In this case, the Government's Complaint explicitly incorporates screenshots from one of the video files compiled by law enforcement reflecting the full sequence of all of the events during the protest on Pleasant Valley Way. *See* Compl., ECF Doc. No. 1, ¶¶ 44-56. The screenshots copied into the Complaint were captured from the video file labeled "4-Full incident" (*see* Rygus Decl., Exh. "B") as follows:

- Image 3 - "Glick swatting away Jane Doe's vuvuzela," (Compl., ¶ 44), appears at timestamp 20:49:10:14 in "4- Full Incident.mp4";

- Image 4 - "Glick grabs and swats away Sharif's vuvuzela" (Compl., ¶ 46), appears at timestamp: 20:49:12:11 in "4- Full Incident.mp4";

- Image 5 - "Sharif charges at Glick and Glick retreats in fear" (Compl., ¶ 48), appears at timestamp: 20:49:13:06 in "4- Full Incident.mp4";

- Image 6 – "Camins points to Silberberg shouting 'The Jew is here!" (Compl., ¶ 51), appears at timestamp: 20:49:24:13 in "4- Full Incident.mp4";

- Image 7 - "Sharif places Silberberg in a neck hold" (Compl., ¶ 54), appears at timestamp: 20:49:26:12 in "4- Full Incident.mp4";

- Image 8 - "Sharif drills Silberberg's head into the ground" (Compl., ¶ 56), appears at timestamp: 20:49:32:06 in "4- Full Incident.mp4".

In other words, each of these screenshots in the Complaint come directly from the video file that law enforcement supplied to counsel for Defendant Sharif, and that Defendant Sharif has supplied to the Court here.

That actual video, rather than the cherry-picked screenshots pasted into the Complaint, "incontrovertibility contradicts" the assertions in the Government's

15

Complaint that "law enforcement formed a defensive line to prevent them from approaching the synagogue property," (Compl., ¶ 33), that "[t]he protestors—now a mob—defied the police's requests and instead surged through the police line, causing the officers to retreat and scatter," (Compl., ¶ 39), that demonstrators "defied" police orders "by entering and spreading out on the synagogue's front lawn[1] where worshipers had gathered," (Compl. ¶ 41), and that Defendant Sharif had "marched onto synagogue property" (Compl., ¶ 43.). None of these contentions is accurate. The actual police video demonstrates none of these assertions ever occurred. There was no "police line"; there was no "retreat and scatter" by law enforcement; there was no "spreading out on the synagogue's front lawn"; and, Defendant Sharif never "marched onto synagogue property." *See* Rygus Decl., Exh. "B," "4- Full Incident.mp4".

In light of the "visible fiction" of the Government's fully contradicted allegations in the Complaint, the Government has failed to present a plausible theory

---

[1] The Government's reference to the synagogue's "front lawn" demonstrates not only a fundamental unfamiliarity with the synagogue property by out-of-state counsel for the Government who seem not to have ever actually viewed the actual layout of the property on Pleasant Valley Way, including the situation of Congregation Ohr Torah within a much larger building that has multiple other occupants and two separate access points that are far away from where Defendant Sharif and the other demonstrators had gathered. In particular, characterizing as a "front lawn" a location that is actually **behind** the building in which the synagogue is housed, and thus nowhere near the synagogue's entrance, nor indeed a space with a "lawn" of any kind, is just a basic mischaracterization of the incontrovertible facts.

of liability. *See, e.g.*, *Romero*, 159 F.4th at 1008 (holding that a complaint is "implausible" when video relied upon by the plaintiff demonstrates "blatant contradiction" with the plaintiff's allegations).

## II.    Plaintiff Has Failed to Plausibly Allege Any Obstruction of a Religious Worship When the Demonstrators Never Reached the Synagogue's Access Points.

Under the FACE Act, liability for using "physical obstruction" to interfere with a person's free exercise of religion means rendering ingress to or egress from a place of religious worship "impassable" or "unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4). However, as demonstrated by the video which the Government itself has incorporated into its pleadings through its screenshots in the Complaint, the demonstrators never reached the synagogue's access points. *See* Rygus Decl., Exh. "B," " 4- Full Incident.mp4".

Indeed, as confirmed by an indisputable Google Maps satellite image of the property where the synagogue is located,[2] the demonstrators' march along the

---

[2] The Court may take judicial notice of the location of a property through consideration of a Google Maps image. *See, e.g.*, *Sondhi v. McPherson Oil Co.*, No. 20-13986, 2021 U.S. Dist. LEXIS 222302, at *8 n.5 (D.N.J. Nov. 17, 2021) (taking judicial notice of a property's location using Google Maps); *Weems v. Curry*, No. 14-7575, 2014 U.S. Dist. LEXIS 171404, at *1 n.1 (D.N.J. Dec. 11, 2014) (same). This principle is well-settled across the federal judiciary. *See, e.g.*, *Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017) (holding that courts may take judicial notice of distances and locations derived from Google Maps because Google Maps is a reliable tool for determining geographic facts); *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (same); *Pahls*

sidewalk of Pleasant Valley Way never even reached the access entrances for either

the front or back access points to the synagogue:



In light of the indisputable record of the police video that the Government

itself has incorporated into its Complaint, there is no plausible basis for finding any

obstruction of a religious service.

---

*v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (collecting cases supporting taking judicial notice of content gleaned from Google Maps and its features given that geographic facts and distances are 'peculiarly susceptible to judicial notice'); *cf. Feminist Majority Found. v. Hurley*, 911 F.3d 674, 711 n.5 (4th Cir. 2018) (Agee, J., dissenting) (finding that Google Maps and its 'Distance Measurement Tool' could be relied upon to determine the general location of a university campus, citing that geographic facts and distances are "peculiarly susceptible to judicial notice"); *see also Tesoro Ref. & Mktg. Co. LLC v. City of Long Beach*, 334 F. Supp. 3d 1031, 1042 (C.D. Cal. 2017) ("We may take judicial notice of maps showing the distances between these locations.").

### III. **Plaintiff Has Failed to Plausibly Allege that Sharif Interfered with Any Religious Worship When Sharif Never Approached the Synagogue.**

The Complaint's breathless narrative of the scuffle involving Defendant Sharif, an incident that led to criminal charges against Moshe Glick and Solomon Silberberg – not Defendant Sharif – fails to plausibly allege any interference of any kind by Sharif with the free exercise of any religious worship when the indisputable video incorporated by the Government in its own Complaint demonstrates that the incident occurred **behind** the building in which the synagogue is housed on the opposite side of the property:



Moreover, there is no allegation in the Complaint that the confrontation between Defendant Sharif and Messrs. Silberberg and Glick (the latter being the person who struck Defendant Sharif with his flashlight opening a gash on Defendant

Sharif's head that required medical treatment) was caused by a motivation from Defendant Sharif to interfere with anyone's exercise of their religious freedom at a place of religious worship. *Compare New Beginnings Ministries v. George*, No. 2:15-cv-2781, 2018 WL 11378829, 2018 U.S. Dist. LEXIS 245391, at \*16 (S.D. Ohio Sept., 18, 2018) (holding that the elements of a FACE Act claim require plausible allegation that the defendant's actions against the plaintiff were "because that person is exercising or is seeking to exercise his or her right of religious freedom at a place of religious worship").

Indeed, the allegations in the Complaint fail to assert any notion that either Messrs. Glick or Silberberg were involved in any form of religious worship, a point that is hardly surprising when the indisputable police video that the Government has incorporated in its own Complaint demonstrates that the two had in fact infiltrated the demonstrators' march on the sidewalk along Pleasant Valley Way, and that Mr. Glick was cautioned numerous times by law enforcement to stop inciting confrontations with demonstrators. *See* Rygus Decl., Exh. "C."

## IV. Plaintiff Has Failed to Plausibly Allege that Sharif's Conduct During the Demonstration Was Not Protected First Amendment Expression.

Under the FACE Act, no liability may be assessed to punish or otherwise prohibit lawful expressive conduct, including picketing or marching in a peaceful demonstration that is otherwise permissible under the First Amendment. *See* 18 U.S.C. § 248(d)(1) ("Nothing in this section shall be construed … to prohibit any

expressive conduct (including peaceful picketing or other peaceful demonstration protected from legal prohibition by the First Amendment."); *cf. New Beginnings Ministries*, 2018 U.S. Dist. LEXIS 245391, at *68 (observing that committing a federal FACE violation is separate from, and not within the scope of, whether a person has committed a state-law assault and battery, that the latter claim is not cognizable under the FACE Act without a showing of motivation to interfere with an exercise of religious worship at a house of worship).

In its Complaint, the Government has attempted to construct a narrative violence when in fact the video of the event that law enforcement collected, and which the Government incorporated by screenshots into the Complaint, demonstrates incontrovertibly that there was no violence on the part of the demonstrators, and that the incident between Defendant Sharif and Messrs. Glick and Silberman had nothing to do with using force against someone who was "exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. 248(a)(2). That scuffle between individuals who had mixed together on the sidewalk next to the fire station on Pleasant Valley Way was nowhere close to the synagogue, and it did not involve anyone who was seeking exercise their right to worship. As such, the scuffle is irrelevant.

Moreover, without the allegations in the Complaint concerning the scuffle, there is no plausible basis upon which to conclude that Defendant Sharif, as well as

all the other demonstrators, were not engaged in the lawful exercise of free speech and assembly. Indeed, the video that the Government has incorporated into its Complaint demonstrates beyond any dispute that the Defendants' conduct on the night of November 13, 2024, along Pleasant Valley Way in West Orange, N.J., was entirely and only expressive conduct that is fully protected by the First Amendment.

### V.    <u>Plaintiff's Allegations Related to Interference with the Planned Gathering at Mr. Glick's Residence Fail to State a Claim Under the FACE Act.</u>

To the extent that the Complaint may allege that Defendants interfered or intimidated worshipers from gathering at Mr. Glick's home (*see* Compl. ¶¶ 17-24, 27, 70) it fails to state a claim against Mr. Sharif under the FACE Act. First, the Complaint fails to allege any facts that Mr. Sharif was personally involved in the events leading up to Mr. Glick deciding to relocate the gathering from his private home to the synagogue. Second, the FACE Act, as applicable here, "protects persons who are practicing their religion 'at places of religious worship,' not persons practicing their religion anywhere." *Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F.4th 47, 59 (2d Cir. 2021). As the Second Circuit noted in *Jingrong*, based upon the legislative history of the FACE Act, "[i]t makes sense that Congress would not have intended the scope of covered places to extend to the wide variety of locations where an individual may engage in religious worship, but which are not primarily used for that purpose, **such as one's home**." *Id.* (emphasis added).

22

As a result, the Complaint fails to plausibly state a claim against Defendant Sharif upon which relief may be granted.

## CONCLUSION

For all the reasons stated herein, Defendant Altaf Sharif respectfully requests that the Court dismiss this Complaint in its entirety as there is no reasonable inference that Mr. Sharif can be liable for any alleged violation of the FACE Act. The Complaint, as currently drafted, asks this Court to consider allegations that are demonstrably false. The Court should decline to do so and dismiss the case.

Respectfully submitted,

Dated: February 20, 2026

s/ Sonya M. Sumner
Sonya M. Sumner
Drew W. Sumner
SUMNER LAW LLP
300 Carnegie Center Drive, Suite 150
Princeton, New Jersey 08540

Jeremiah Rygus
Christopher P. Beall
RECHT KORNFELD, P.C.
90 Broad Street, Suite 703
New York, New York 10004

*Attorneys for Defendant Altaf Sharif*