# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, | |
| v. | No. 2:25-cv-16049 |
| PARTY FOR SOCIALISM AND LIBERATION NEW JERSEY; | MOTION DATE: APRIL 6, 2026 |
| AMERICAN MUSLIMS FOR PALESTINE NEW JERSEY; | |
| TOVA FRY a/k/a TERRY KAY; | |
| ALTAF SHARIF; | |
| MATT DRAGON; | |
| ERIC CAMINS; | |
| JANE DOE; and | |
| JOHN DOE, | |
| *Defendants*. | |

## UNITED STATES' OPPOSITION TO

## DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................... i

TABLE OF AUTHORITIES..................................................................... ii

INTRODUCTION ..............................................................................1

FACTUAL BACKGROUND ....................................................................2

LEGAL STANDARD ...........................................................................6

ARGUMENT ..................................................................................7

   I.   The complaint alleges that defendants violated the FACE Act. .....................7

      a.   The Complaint alleges that Defendants' victims were exercising the right of religious freedom at a place of religious worship .........................................7

      b.   The Complaint alleges that Defendants Sharif and Jane Doe used "force" 12

      c.   The Complaint alleges that defendants Fry, Sharif, Camins, Jane Doe and AMP used "force" or "threat of force" .........................................................13

      d.   The Complaint alleges that defendants Fry, Sharif, Dragon, Camins, Jane Doe, and John Doe used "physical obstruction"...............................................18

   II.   Defendants' conduct is not protected by the First Amendment.....................22

      a.   Defendants were engaged in conduct, not speech ...................................22

      b.   Prosecuting FACE Act crimes does not violate Defendants' right to free assembly .........................................................................................24

   III.   Defendants' remaining arguments lack merit ..........................................25

      a.   The Complaint adequately alleges traceability ..........................................25

      b.   The United States is not required to plead intent.......................................26

      c.   "International law" is irrelevant.................................................................28

      d.   *Younger* abstention does not bar the suit against Camins ..........................29

      e.   The Court may not consider the extrinsic evidence introduced by Sharif.30

CONCLUSION..................................................................................34

i

**TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 66 (2009) ...................................................................6, 13

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991)....................................................23

*Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012)..........................................18

*Bhd. of Ry. & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. Fla. E. Coast Ry. Co.*, 384 U.S. 238 (1966) ..........................................................25

*Borowski v. Kean Univ.*, 68 F.4th 844 (3d Cir. 2023). .............................................29

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)......................................10

*Counterman v. Colorado*, 600 U.S. 66 (2023)...........................................................14

*Custis v. United States*, 511 U.S. 485 (1994).............................................................28

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) .................................................................11

*Davis v. Cisneros*, 744 F. Supp. 3d 696  (W.D. Tex. 2024) .....................................23

*Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545 (3d Cir. 2017).....................................27

*Doriety v. Sletten,* 109 F.4th 670 (4th Cir. 2024) ......................................................33

*Edwards v. South Carolina*, 372 U.S. 229 (1963)......................................................24

*Eichenwald v. Rivello*, 318 F. Supp. 3d 766 (D. Md. 2018) .....................................12

*Esco v. City of Chicago*, 107 F.4th 673 (7th Cir. 2024).............................................34

*Falcone v. Dickstein*, 92 F.4th 193 (3d Cir. 2024) ....................................................23

*Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288 (10th Cir. 2025).......... 31, 32

*Fuster v. Twp. of Chatham*, 328 A.3d 894 (N.J. 2025) ..............................................32

*Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116 (3d Cir. 2016). ......................................................................................................................32

*Helmann v. Codepink Women for Peace,* No. 2:24-cv-05704-SVW-PVC, 2025 WL 3030582 (C.D. Cal. June 13, 2025).....................................................................9

*Hendricks v. S. Bell. Tel. & Tel. Co.*, 387 S.E.2d 593 (Ga. App. 1989)............ 12, 17

*In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125 (3d Cir. 2016)................30

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ...............31

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357 (3d Cir.

1993). ........................................................................................................................31

*Matter of Gauthier*, 222 A.3d 707 (N.J. Super App. Div. 2019) .............................29

*Medellin v. Texas*, 554 U.S. 759 (2008),................................................................28

*Melugin v. Hames*, 38 F.3d 1478 (9th Cir. 1994).......................................................16

*Murray-Nolan v. Rubin,* 144 S. Ct. 2560 (2024) ......................................................23

*New York by James v. Griepp*, 11 F.4th 174 (2d Cir. 2021)....................................20

*New York by James v. Red Rose Rescue,* 771 F. Supp. 3d 311 (S.D.N.Y. 2025) .....19

*New York v. Griepp*, 991 F.3d 81 (2d Cir. 2021).............................................. 20, 22

*New York v. Operation Rescue National*, 273 F.3d 184 (2d Cir. 2001......................20

*New York v. Rescue*, 705 F. Supp. 3d 104 (S.D.N.Y. 2023)....................................22

*Norton v. Ashcroft*, 298 F.3d 547 (6th Cir. 2002)............................................... 24, 25

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir.

1993) ........................................................................................................................32

*People v. Griepp,* 997 F.3d 1258 (2d Cir. 2021) .....................................................20

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008)......................................6

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,

290 F.3d 1058 (9th Cir. 2002)................................................................. 14, 15, 16

*Presbyterian Church in United States v. Mary Elizabeth Blue Hull Mem'l*

*Presbyterian Church*, 393 U.S. 440 (1969).........................................................9

*Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128 (3d Cir. 2010)..............................21

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47 (2006)...................23

*Scott v. Harris*, 550 U.S. 372 (2007)......................................................................33

iii

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) .......................................................................28

*State v. Gomes*, 288 A.3d 825, 830 (N.J. 2023) ....................................................................29

*State v. Silberberg*, No. 25000580 (Essex Co., N.J., March 5, 2026)......................29

*Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321 (Fed. Cir. 2010) .............................25

*Thunder Studios, Inc. v. Kazal*, 13 F.4th 736 (9th Cir. 2021) ................................23

*United States v. Balint,* 201 F.3d 928 (7th Cir. 2000) ...............................................27

*United States v. Ballard*, 322 U.S. 78 (1944)..........................................................10

*United States v. Mahoney*, 247 F.3d 279 (D.C. Cir. 2001) ......................................19

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002)..............................................17

*United States v. Seeger*, 380 U.S. 16 (1965)............................................................10

*United States v. Wilson*, 2 F. Supp. 2d 1170 (E.D. Wis. 1998) ...............................27

*Virginia v. Black*, 538 U.S. 343  (2003) ...................................................................22

*Younger v. Harris*, 401 U.S. 37 (1971) ...................................................................29

## Statutes

18 U.S.C. § 245 ...........................................................................................................17

18 U.S.C. § 248 ........................................................... 1, 7, 8, 11, 12, 13, 15, 18, 27

28 U.S.C. § 1331 .........................................................................................................28

## Other Authorities

H.R. Rep. No. 103-488 (1994)......................................................................................7

U.S. Const. Amend. I ..................................................................................................24

## Rules

Federal Rule of Civil Procedure 12 .........................................................................6, 30

iv

**INTRODUCTION**

On November 13, 2024, an angry mob stormed a police line, descended upon a Jewish synagogue, trespassed on its property, and disrupted a worship service.  One Jewish congregant was brutally assaulted.  Others were unable to safely access their house of worship.  Defendants organized, incited, and/or participated in the mob.

As alleged in the Complaint, the mob's conduct clearly violates the Freedom of Access to Clinic Entrances Act (FACE Act).  The Act provides that whoever "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship" may be subject to injunctive relief and face civil penalties.  18 U.S.C. § 248(a)(2).

The Complaint pleads all of the statutory elements.  Members of the mob impeded or blocked access to the synagogue and intimidated or injured Jewish congregants seeking to worship.  Defendants seek to dismiss the Complaint by alleging, among other arguments, that the congregants were not participating in a religious event at the synagogue, and that their own unruly mob activity was itself protected by the First Amendment.  These arguments contradict elementary principles of First Amendment law, and their remaining panoply of arguments are equally meritless.  This Court should deny their motions to dismiss.

1

## FACTUAL BACKGROUND

This case arises out of "a coordinated effort to intimidate and disrupt Jewish worshipers at a religious event held at the synagogue Congregation Ohr Torah, in West Orange, New Jersey." Compl. ¶ 1, Dkt. 1. Moshe Glick, a Jewish man, organized a religious event in his home, originally scheduled for November 13, 2024. *Id.* ¶ 17. The event was supposed to promote "the Jewish obligation to live in the Land of Israel, a tenet of Jewish faith." *Id.* It was designated "as an Israel real estate fair and 'Ruach' (Spiritual) event." *Id.*

According to the Complaint, on November 4, 2024, Defendant Tova Fry "deliver[ed] a threatening letter to Glick's home, signed by AMP and other anti-Israel organizations, demanding cancellation of the event." Compl. ¶ 20. When delivering the letter, Fry photographed Glick's home. *Id.* ¶ 21. Upon further investigation, Glick and his private security "discovered that Defendants PSL and AMP were posting on social media, calling for supporters to gather . . . near Glick's home to protest the event." *Id.* ¶ 24. PSL and AMP knew their posts "would foreseeably lead to violence and intimidation." *Id.* ¶ 71. After Glick's security team "advised that they could not guarantee his safety at his home," the event was "relocated to Congregation Ohr Torah, a synagogue a short walk from Glick's home." *Id.* ¶ 27. The event "was to include prayer, a religious memorial service [for a deceased rabbi], a Torah sermon, religious songs with biblical verses, prayerful

2

dancing, educational activities about the religious obligation to live in Israel, a real estate fair, and a festive barbecue in the synagogue's parking lot—all part of the religious observance." *Id.* ¶ 28.

On November 12, Glick "emailed local law enforcement, expressing concerns about worshiper safety." Compl. ¶ 29. He asked the police whether the protestors had a permit, and the "police informed Glick that the protestors lacked a permit," but officers would be stationed nearby, "and additional patrols near Glick's home would be deployed." *Id.*

On November 13, "approximately 50 protestors, many wearing masks to conceal their identities and carrying vuvuzelas," which are "long thin horns capable of causing permanent noise-induced hearing loss," "gathered at an intersection near Glick's home." Compl. ¶¶ 30-31. After "learning the event had moved to Congregation Ohr Torah, the protestors marched toward the synagogue, passing Jewish homes and shouting at residents." *Id.* ¶ 32. Police then "formed a defensive line to prevent them from approaching the synagogue property where worshipers had gathered." *Id.* ¶ 33. Police "asked the protestors to cross the street or at least stop at the [nearby] fire station, but the protestors refused." *Id.* ¶ 35.

Despite police orders to "step back," the protestors, "now a mob . . . surged through the police line, causing the officers to retreat and scatter." Compl. ¶ 39. Defendant Matt Dragon now allegedly led the mob, which "marched onto

3

Congregation Ohr Torah synagogue property, shouting and blowing vuvuzelas." *Id.* ¶ 40. The mob continued to defy police orders to "stay off the synagogue property." *Id.* ¶ 41. It "disrupted the religious event by blowing vuvuzelas to drown out the memorial service and Torah sermon making it impossible for worshipers to hear." *Id.* ¶ 42.

The Complaint alleges that some of the individual defendants then assaulted Jewish congregants. Altaf Sharif and Jane Doe "marched onto synagogue property blowing vuvuzelas and identified Glick. Jane Doe approached within inches of Glick's face, blowing her vuvuzela directly in Glick's ear as a weapon." Compl. ¶ 43. Glick "swatted Jane Doe's vuvuzela away as Jane Doe used the vuvuzela as a weapon." *Id.* ¶ 44. Upon observing Glick's acting in self-defense, Sharif "became visibly enraged" and "blew his vuvuzela directly in Glick's face." *Id.* ¶ 45. He also "charged at Glick with intent to cause serious bodily harm," as depicted in images included in the Complaint. *Id.* ¶ 47; Images 4-5. Eric Camins initially attempted to stop Sharif's assault, but after a Jewish congregant named David Silberberg sprayed pepper spray in Sharif's eyes in an effort to protect Glick, Camins "changed his stance, pointed at Silberberg, and shouted, 'The Jew is here!'" *Id.* ¶ 51. Sharif then attacked Silberberg, "grabbing him behind the neck" and "encircling [him] in a neck hold." *Id.* ¶¶ 53-54. Sharif "applied the full force of his body against Silberberg's neck to throw him to the ground on synagogue property. Once Silberberg was on

4

the ground, Sharif dragged him down a hill from the synagogue's front lawn toward the synagogue's parking lot." *Id.* ¶ 55. Sharif "then completely flipped Silberberg over and drilled Silberberg's head into the ground." *Id.* ¶ 56. He "dragged Silberberg another ten to fifteen feet to the Synagogue parking lot," where Camins and Jane Doe watched as he "brutally attacked Silberberg." *Id.* ¶¶ 57-58. The assault finally ended when Glick "hit Sharif on the head with his flashlight in defense of Glick's life." *Id.* ¶ 60.

Law enforcement "immediately ordered the mob off synagogue property." Compl. ¶ 62. The mob continued to "intimidate the Jewish worshipers" by chanting phrases such as "Moshe Glick you can't hide!" and "You're next! You're next!" *Id.* ¶ 63. John Doe set off a stink bomb "to further obstruct the Jewish congregants['] attempt to worship." *Id.* ¶ 64.

The mob successfully disrupted the religious event. The Complaint alleges that "Dragon caused several individuals to refrain from attending the religious event out of fear and forced worshipers to move the service to another location within synagogue property, effectively blocking freedom of movement and obstructing access to the event." Compl. ¶ 65. The mob's "unpermitted protest obstructed the public sidewalk on one side of synagogue rendering passage for worshipers unreasonably difficult and hazardous. Worshipers would have had no choice but to overcome the obstruction by either walking through the angry mob or by risking

5

their safety by walking on the busy street during heavy vehicular traffic and low visibility during the evening hours." *Id.* ¶ 66.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."[1]  To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face," *i.e.*, to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citations omitted).  The court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted).

---

[1] One Defendant, Tova Fry, separately makes an argument based on Rule 12(b)(1) in addition to 12(b)(6).  Fry Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 62-1 at 19. Below, we separately address the standard for that discrete portion of the Fry Motion.

**ARGUMENT**

**I.  The complaint alleges that defendants violated the FACE Act.**

The FACE Act provides that whoever "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship" may be subject to injunctive relief and face civil penalties.  18 U.S.C. § 248(a)(2).  The Act reflects Congress's "profound concern . . . over private intrusions on religious worship, and the judgment of the Congress that the exercise of the right to religious liberty deserves federal protection."  H.R. Rep. No. 103-488 at 9 (1994).  The United States has alleged a FACE Act violation against each Defendant.

**a.  The Complaint alleges that Defendants' victims were exercising the right of religious freedom at a place of religious worship**

The Complaint indisputably establishes that challenged conduct occurred at a place of religious worship.  Congregation Ohr Torah is a synagogue, Compl. ¶ 1. Defendants Fry, Sharif, Dragon, Camins, Jane Doe, and John Doe are all alleged to have entered Congregation Ohr Torah's real property. *Id.* ¶¶ 11-16, 40.  Sharif allegedly assaulted Silberberg in Congregation Ohr Torah's parking lot, as Camins and Jane Doe watched and encouraged him.  *Id.* ¶¶ 49-60.  Moshe Glick's home, where the threatening letter was delivered on November 4, 2024 and where the event

7

was initially scheduled and advertised to be held, has a room designated for communal prayer and study, containing a Jewish library with prayer books and sacred texts, where he hosted numerous prayer groups. *Id.* ¶¶ 1, 11, 20.

The Complaint further establishes that Defendants' victims were "exercising or seeking to exercise the First Amendment right of religious freedom." 18 U.S.C. § 248(a)(2). The event that Defendants disrupted "was to include prayer, a religious memorial service . . . a Torah sermon, religious songs with biblical verses [and] prayerful dancing," all of which are hallmarks of Jewish religious worship. Compl. ¶ 28.

Defendants' counterarguments posit that the members of Congregation Ohr Torah were not practicing true Judaism. They claim that there "were no religious services occurring at Congregation Ohr Torah," Sharif Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 65-1 at 1, and that the event was actually a "commercial real estate land sale . . . not a religious practice," Camins Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 66-1 at 5 n.2; *see also* Dragon Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 64 at 20. Fry argues that the United States fails to "cite a single passage from Jewish law" about the religious obligation to live in Israel and that a study of "halacha" (Jewish law) would reveal no such obligation. Fry Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 62-1 at 16-17. In other words, they believe that "the land sale event could not plausibly be interpreted as an exercise of the First

Amendment right of religious freedom," AMP Mem. in Supp. of Mot. to Dismiss, Dkt. 63-1 at 7 (quotation marks, citation and alterations omitted), and they expect this Court to hold that the event at Congregation Ohr Torah was not *bona fide* Judaism.

These arguments contradict elementary principles of First Amendment law. This Court has "no role in determining ecclesiastical questions" and cannot decide whether Jewish law requires, prohibits, or is silent about whether Jews should live in Israel. *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 447 (1969). The Complaint plainly alleges that the event at Congregation Ohr Torah involved what the congregants sincerely believed to be various religious elements in furtherance of their "religious obligation to live in Israel." Compl. ¶ 28. At the motion-to-dismiss stage, the Court must take the United States's "allegations regarding the religious nature of the Aliyah Event as true" and that disruption of the event "pertained to an exercise of First Amendment rights." *Helmann v. Codepink Women for Peace*, No. 2:24-cv-05704-SVW-PVC, 2025 WL 3030582, at *1 n.2 (C.D. Cal. June 13, 2025).[2]

---

[2] "Aliyah" is Hebrew for "to go up." It refers to "a common belief among Orthodox [and other] Jews . . . that returning to and dwelling in Israel is a religious commandment." *Helmann*, 2025 WL 3030582 at *1 n.2.

For the same reason, Defendant Camins's argument that "[t]he Complaint violates the Establishment Clause," Dkt. 66-1 at 9-11, also misses the mark.  Camins seems to believe that in order to adjudicate Complaint's allegations, this Court would have to determine what practices, as a factual matter, constitute tenets of Jewish faith.  *Id.* at 10. But that is not the case.  The Complaint alleges that *Glick* believed that the event is a "'Ruach' (Spiritual) event" and that he advertised it accordingly. Compl. ¶ 17.  The Complaint does not allege, Defendants need not admit nor deny, and this Court will never be required to "evaluate the degree to which a duty to live in Israel is a tenet of the Jewish faith."  Dkt. 66-1 at 11.  At the most, the Court may have to inquire into the sincerity of the congregants' religious views.  *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014); *United States v. Seeger*, 380 U.S. 163, 176 (1965).  It will not have to examine "the truth or falsity of the religious beliefs."  *United States v. Ballard*, 322 U.S. 78, 88 (1944).[3]

Contrary to Camins's argument the Complaint in no way "privileges a subset of Jewish people over Muslims, Christians, and non Zionist [sic] Jewish people."

---

[3] Similarly, the Complaint in no way "silence[s] other religious which have also asserted . . . a claim" to the Holy Land by advancing a "Jewish claim" to the same territory. Dkt. 66-1 at 10.  The United States does not and cannot take a position as to whether Judaism, Christianity, Islam, or any other faith has a valid claim to the Holy Land.  It merely alleges that members of Congregation Ohr Torah were exercising or seeking to exercise their right of religious freedom at a place of religious worship.

Dkt. 66-1 at 10. The argument is absurd. The Complaint seeks to protect and vindicate the rights of the victims in this case. Enforcement of the FACE Act does not favor one religion over another but rather protects *all individuals* seeking to exercise their First Amendment right of religious freedom against *anyone* who seeks to obstruct such exercise by violence or threat of violence. The Constitution is not violated when the government seeks to safeguard constitutional rights. *See, e.g., Cutter v. Wilkinson*, 544 U.S. 709 (2005) (upholding the Religious Land Use and Insittutionalized Persons Act in face of a similar Establishment Clause challenge). In this case Jews were attacked while members of other faiths were not. And the Defendants were "selected" not based on their faith or belief, but based on their actions that precipitated this case. Nor does the Complaint privilege one particular view of Jewish law over another. Defendants can continue to debate what Jewish law requires of them or others. But they cannot use "force or threat of force or . . . physical obstruction" to injure or interfere with others seeking to exercise their religious liberties. 18 U.S.C. § 248(a)(2). All the Complaint alleges is that, in violation of the FACE Act, Defendants did use "force or threat of force or . . . physical obstruction" to interfere with Glick and other event attendees while they were seeking to exercise their religious freedom. Thus, Camins's Establishment Clause argument falls flat.

### b. The Complaint alleges that Defendants Sharif and Jane Doe used "force"

According to the Complaint, Sharif and Jane Doe, while on the property of Congregation of Ohr Torah, each "used vuvuzelas as weapons" and blew them "directly within inches of [Glick's] ear." Compl. ¶¶ 73-74. Because vuvuzelas are "reasonably known to lead to permanent noise-induced hearing loss," *id.* ¶ 73, the United States plausibly has alleged that Sharif's and Jane Doe's use of a vuvuzela constitutes "force" under the FACE Act. *See Hendricks v. S. Bell. Tel. & Tel. Co.*, 387 S.E.2d 593, 594–95 (Ga. Ct. App. 1989) (noise can be battery); *cf. Eichenwald v. Rivello*, 318 F. Supp. 3d 766, 774 (D. Md. 2018) (physical touch is not always required to establish battery). The Complaint further alleges that Sharif used force against Silberberg by grabbing his neck, throwing him to the ground, drilling his head into the ground, and dragging him to the parking lot. Compl. ¶¶ 51-58.

This alleged use of force as an obvious attempt to injure or intimidate worshipers. The Court reasonably can infer that by blowing a loud vuvuzela within inches of Glick's ear, Sharif and Jane Doe attempted to "intentionally injure[]" Glick or "intimidate him." 18 U.S.C. § 248(a)(2). And Sharif's alleged physical assault of Silberman plainly was an attempt to injure—or at the very least—intimidate him.

Sharif improperly attempts to raise factual disputes in seeking dismissal. He claims that he did not use "physical force," Dkt.65-1 at 5, but the Complaint clearly alleges otherwise, and any factual disputes as to whether he actually used force are

12

to be resolved at summary judgment or trial.  He also argues that Glick and Silberberg were not "involved in any form of religious worship." *Id.* at 20.  But the question is not whether Glick and Silberberg were involved in religious worship at the exact time Sharif allegedly assaulted them.  It is whether they were "seeking to exercise" the right to worship.  18 U.S.C. § 248(a).  The Complaint's allegations establish that Glick is Jewish, organized a Jewish religious event, and was present at the Jewish house of worship hosting the event when Camins and Jane Doe assaulted him with vuvuzelas.  Compl. ¶¶ 17, 28, 43.  The Complaint likewise alleges that Silberberg is Jewish, was a "worshiper," and was present at a Jewish house of worship during a religious event when Camins assaulted him. *Id.* ¶¶ 49-61.  At the motion-to-dismiss stage, this court may "draw the reasonable inference that the defendant is liable for the misconduct alleged" *Iqbal*, 556 U.S. at 678, that when Jews are present at a Jewish house of worship during a Jewish religious event, they are "seeking to exercise" their right to worship.

### c.  The Complaint alleges that defendants Fry, Sharif, Camins, Jane Doe and AMP used "force" or "threat of force"

Contrary to Defendants' arguments, the United States plausibly alleged that all Defendants used "force or threat of force" to "intimidate or interfere with" Glick and others while they were "lawfully exercising or seeking to exercise the[ir] First Amendment right of religious freedom at a place of religious worship."  18 U.S.C. § 248(a)(2).  While "the First Amendment protects speech that advocates violence,"

13

it does only "so long as the speech is not directed to inciting or producing imminent lawless action and is not likely to incite or produce such action." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1071 (9th Cir. 2002) (en banc). In other words, "while advocating violence is protected, threatening a person with violence is not." *Id*. at 1072. But Defendants did make such threats of violence against the victims, here.

The Complaint alleged that Fry threatened violence by showing up, uninvited, at Glick's house and publicizing his address with the intent to cause further harassment of Glick. Specifically, the Complaint alleges that Fry "took photographs of Glick's home from the street, indicating an intent to disseminate his address to others to facilitate further intimidation or harm." Compl. ¶ 11. The Complaint further alleges that prior to the events described therein, there was a similar violent incident targeting the same type of event in Bergenfield, NJ, which was also organized by Defendant AMP. *Id*. ¶¶ 9, 25-26. In the full context of this background, Fry's actions constituted true "threats of force" unprotected by the First Amendment. And in light of the fact that the very organization that authored the letter which Fry delivered also organized prior violent protests, publicizing Glick's address was at the very least reckless. *See Counterman v. Colorado*, 600 U.S. 66, 82 (2023).

Fry's actions are similar to those held to be true threats by the Ninth Circuit in *Planned Parenthood of Columbia/Willamette*. There, the Court held that the

14

actions of anti-abortion activist organizations in publicly disclosing, through "Guilty" posters and a website, names and addresses of abortion providers, constituted true "threats of force" within meaning of FACE, even though neither the posters nor the web site "contain[e] any language that [wa]s overtly threatening." 290 F.3d at 1085. As the Court explained, "the language itself is not what is threatening. Rather, it is . . . the context of the poster pattern—poster followed by murder—that constitutes the threat." *Id.*

The same logic applies here. While the letter and the publication of Glick's address may not themselves be "true threats" when viewed in a vacuum, in context of prior violent demonstration organized by the very same Defendants, they do constitute "true threats." After all, a "threat" is something that "intimidates" a person, which in turn means "plac[ing] a person in reasonable apprehension of bodily harm to him—or herself or to another." *Id.* at 1071 (quoting 18 U.S.C. § 248(e)(3)). And just like in *Planned Parenthood of Columbia/Willamette*, where defendants intimidated doctors seeking to provide abortion services by releasing their addresses, Fry also intimidated Glick from engaging in "exercis[ing] [his] First Amendment right of religious freedom at a place of religious worship" by publishing his address. 18 U.S.C. § 248(a)(2).[4] In any event, whether these actions are "true

---

[4] More chillingly, the threat was delivered privately, and not through the mail or a professional server of process. This shows that the letter was never intended a legal

threats" and whether *mens rea* elements are met are jury questions not amenable to a resolution on a motion to dismiss. *Planned Parenthood of Columbia/Willamette*, 290 F.3d at 1069 ("[T]he issue whether the prosecution has shown a 'true threat' is a question of fact for the jury, not a question of law for the court.") (quoting *Melugin v. Hames*, 38 F.3d 1478, 1485 (9th Cir. 1994)).

The same argument also applies to AMP. The Complaint alleges that AMP "AMP were posting on social media, calling for supporters to gather on November 13, 2024, near Glick's home to protest the event." Compl. ¶ 24. This advertising continued even after the protest in Bergenfield turned violent. *See id.* ¶¶ 26, 67, 71. As in *Planned Parenthood of Columbia/Willamette*, it is unnecessary to plead that AMP's social media poster was itself explicitly threatening; "[r]ather, it is . . . the context of the poster pattern . . . that constitutes the threat." 290 F.3d at 1085.

With respect to Defendants Camins, Sharif, and Dragon, the analysis is straightforward. The Complaint alleges that Sharif physically assaulted David Silberberg. Compl. ¶¶ 49-58. This is a sufficient allegation of actual use of force. The Complaint also specifically alleged that Sharif "charg[ed] towards Glick" with

---

notice to establish a case in court, as such documents are delivered using certified mail or professional servicer. Instead, the delivery was accomplished privately precisely to send a message of intimidation. *See Planned Parenthood of Columbia/Willamette*, 290 F.3d at 1086 ("[A] privately communicated threat is generally more likely to be taken seriously than a diffuse public one . . ..").

16

"intent to harm Glick." *Id.* ¶ 49. A charge with intent to harm is black-letter law definition of the tort of assault and therefore qualifies as a "threat of force." Moreover, the Complaint alleged that Sharif used a vuvuzela "as [a] weapon[] to drown out the religious service, making it impossible for worshipers to hear the memorial service and Torah sermon, effectively denying access to the event." *Id.* ¶ 73. As explained above, excessive noise in and of itself can constitute battery, not to mention be sufficient to "intimidate." *See Hendricks*, 387 S.E.2d at 594–95.

As to Camins, the Complaint alleges that he yelled, "The Jew is here!" Compl. ¶ 51. In context, and with all inferences drawn in favor of the United States, this phrase can be seen as an exhortation to the mob to an imminent lawless action— *i.e.*, to an attack David Silberberg. This exclamation is not protected speech, but unprotected "true threat." *Cf. United States v. Nelson*, 277 F.3d 164, 168-70 (2d Cir. 2002) (holding that shouts like "Get the Jew" can, in the right context, serve as a basis for a criminal conviction "under 18 U.S.C. § 245(b)(2)(B) for willfully injuring, intimidating, and interfering with [a Jewish man], by force and threat of force, because of [that man's] Jewish religion . . ..").

Finally, as to Dragon, the Complaint alleged that he "led a mob that broke through a police line, defied lawful police orders to stop, and marched onto synagogue property with intent to intimidate and obstruct Jewish worshipers, preventing access to the religious event at the Congregation Ohr Torah synagogue."

17

Compl. ¶ 72. These actions "caused several individuals to refrain from attending the religious event out of fear" for their safety. *Id.* ¶ 65. By definition "br[eaking] through a police line" is conduct involving use of force. *Cf. Bernini v. City of St. Paul*, 665 F.3d 997, 1006 (8th Cir. 2012) (holding that it was reasonable for police to respond with force where "a growing crowd intended to penetrate a police line."). And causing individuals to forgo "exercise[ing] the[ir] First Amendment right of religious freedom at a place of religious worship" because of fear for their physical safety is the very definition of "intimidation." 18 U.S.C. § 248(e)(3) ("The term 'intimidate' means to place a person in reasonable apprehension of bodily harm to him- or herself or to another.").

Thus, the United States adequately pleaded that each of the Defendants used "threat of force" to inhibit Glick and others from exercising their religious freedoms.

### d. The Complaint alleges that defendants Fry, Sharif, Dragon, Camins, Jane Doe, and John Doe used "physical obstruction"

The FACE Act defines "physical obstruction" as "rendering impassable ingress to or egress from a facility that provides reproductive health services or to or from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4). Taken as true, as it must be at this stage, the Complaint pleads that Defendants Fry, Sharif, Dragon, Camins, Jane Doe, and John Doe violated the FACE

18

Act by physically obstructing worshipers at, or seeking access to, Congregation Ohr Torah.

Courts have interpreted the term "physical obstruction" very broadly and "have found that a wide variety of obstructive acts can constitute 'physical obstruction' for purposes of the FACE Act." *New York by James v. Red Rose Rescue,* 771 F. Supp. 3d 311, 326–27 (S.D.N.Y. 2025). For example, in *United States v. Mahoney*, the District of Columbia Circuit explained that the FACE Act "does not limit physical obstruction to bodily obstruction, but rather is broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult." 247 F.3d 279, 284 (D.C. Cir. 2001). Thus, the court found that a defendant physically obstructed clinic access where he "positioned himself three feet" from an abortion clinic's door and "prayed aloud." *Id.* at 283. His actions "contribut[ed] to [a] demonstration," and as a "foreseeable and intended consequence of his action," patients were forced to use a rear entrance. *Id.* at 284. Likewise, in *United States v. Gregg*, 32 F. Supp. 2d 151, 153 (D.N.J. 1998), *aff'd,* 226 F.3d 253 (3d Cir. 2000), defendants blocked a staircase inside an abortion clinic. This Court held that "defendants engaged in physical obstruction" because they made "ingress into [the clinic] unreasonably difficult, in that persons seeking to enter [the clinic] had to step or climb over the bodies of defendants." *Id.* at 156.

19

In *New York v. Griepp*, 991 F.3d 81 (2d Cir. 2021), *vacated on unrelated grounds sub nom. by New York by James v. Griepp*, 11 F.4th 174 (2d Cir. 2021) *and vacated sub nom. People v. Griepp,* 997 F.3d 1258 (2d Cir. 2021), pro-life protestors repeatedly gathered outside an abortion clinic in an effort to speak to women seeking abortions while clinic escorts attempted to prevent the protestors from doing so.  To access the clinic, the women had to navigate a "modestly sized sidewalk."  *Id.* at 105.  Protestors' signs "spanned two-thirds of the sidewalk and thereby significantly limited the space available" or "otherwise caused crowding."  *Id.* at 106, 110.  The Second Circuit found that the protestors violated the FACE Act.  It explained that "[p]hysical obstruction need not be direct."  *Id.* at 104.  "Requiring patients to navigate through such a chaotic scene, even if a patient is not subject to a lengthy delay or forced to deviate significantly, is still making the patients' access 'unreasonably difficult.'"  *Id.* at 105.  Likewise, in *New York v. Operation Rescue National*, 273 F.3d 184, 194 (2d Cir. 2001), which presents a similar fact pattern, the Second Circuit determined that there was "strong" evidence of physical obstruction where protestors "interfered with pedestrians as they approach the building" and "shout[ed] at them."

These cases demonstrate that Defendants' alleged actions constitute "physical obstruction" under the FACE Act.  Dragon led a mob onto Congregation Ohr Torah's property and was joined by Fry, Sharif, Camins, Jane Doe, and John Doe.  Compl.

¶¶ 11-16. As the Complaint details at length, *see supra*, pp. 2-6, the mob created a "chaotic scene." Its members occupied the synagogue's front lawn, shouted at worshipers, and blew vuvuzelas. *Id.* ¶¶ 40-41. Some worshipers were unable to attend the religious service, which eventually was relocated. *Id.* ¶ 80. Other worshipers plainly faced "unreasonably difficult" obstacles when attempting to access the synagogue. *Id.* ¶ 66. They had to either "walk[] through the angry mob" or "risk[] their safety by walking on the busy street during heavy vehicular traffic and low visibility during the evening hours." *Id.*

Camins does not deny that his conduct constitutes "physical obstruction." Defendants' remaining arguments are unpersuasive. Fry acknowledges that the Complaint alleges that she "joined a mob that broke through a police line [and] marched onto Congregation Ohr Torah synagogue property." Dkt. 62-1 at 11 (citation omitted). It is a clear allegation that Fry was present on the synagogue's property and therefore contributed to the "chaotic scene" that, as described elsewhere in the Complaint, rendered passage to Congregation Ohr Torah unreasonably difficult. Sharif relies on video evidence purportedly showing that there was no obstruction because the mob "never reached the synagogue's access points." Dkt. 65-1 at 17. But at this stage, the Court must assume the truth of the Complaint's allegations and draw all reasonable inferences in favor of the United States. *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). Thus,

21

Sharif's characterizations of the video (which as discussed below, cannot be considered at the motion-to-dismiss stage anyway, *infra*, pp. 30-34) is not a proper substitute for attacking the legal sufficiency of the Complaint.  But even taking Sharif's characterization at face value, his argument still fails.  Even if the mob failed to reach the synagogue's doors, its obstruction of the sidewalk and synagogue's lawn suffices to establish "physical obstruction."  *See Griepp*, 991 F.3d at 105; *see also New York by James v. Rescue*, 705 F. Supp. 3d 104, 124 (S.D.N.Y. 2023) (that congregants "may eventually have reached" the synagogue is "beside the point.") (citation omitted).    Lastly, Dragon claims that there was no "restriction of movement," Dkt. 64 at 13, but the Complaint alleges otherwise.  *E.g.*, Compl. ¶ 66 ("The unpermitted protest obstructed the public sidewalk on one side of synagogue.").    Once again, a motion to dismiss is not a proper vehicle for adjudication of factual disputes.

**II.Defendants' conduct is not protected by the First Amendment**

**a.  Defendants were engaged in conduct, not speech**

"The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech."  *Virginia v. Black*, 538 U.S. 343, 358 (2003).  However, the Supreme Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.  Instead, [it has] extended First Amendment protection only to conduct that is

inherently expressive." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 65-66 (2006) (internal quotation marks and citation omitted).  Conduct is "inherently expressive" where the actor "intend[s] to convey a particularized message" and there is a "high likelihood that the message will be understood by those who view it." *Falcone v. Dickstein*, 92 F.4th 193, 206 (3d Cir. 2024) (cleaned up), *cert. denied sub nom. Murray-Nolan v. Rubin,* 144 S. Ct. 2560 (2024).  *See also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 577 n.4 (1991) (Scalia, J., concurring) ("[I]nherently expressive" conduct "is normally engaged in for the purpose of communicating an idea.").  While the First Amendment protects speech that "only expressed political opposition or was emotionally charged rhetoric," the Constitution offers no protection to speech that while "does not explicitly threaten violence," but is made "against a known background of targeted violence." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021).  Thus, even "inherently expressive" conduct loses its protection when it devolves into threats. *See Davis v. Cisneros*, 744 F. Supp. 3d 696, 728-32 (W.D. Tex. 2024).

Defendants' abusive conduct was not "inherently expressive" and therefore is unprotected by the First Amendment.  As discussed above, *supra* pp. 2-6, Fry and AMP allegedly delivered a threatening letter directed at Glick at his home and photographed the home where the event was intended to be held, while Camins allegedly incited violence by yelling, "The Jew is here!"  Defendants' remaining

23

actions were not "inherently expressive." Sharif allegedly assaulted Silberberg. Compl. ¶¶ 49-60. Sharif argues that he engaged in "only expressive conduct that is fully protected by the First Amendment," Dkt. 65-1 at 22, but it should go without saying that beating up Jews is not free speech. Camins, Dragon, Fry, Jane Doe, and John Doe are all alleged to have participated in a mob that trespassed on synagogue property and obstructed worshipers and those seeking to worship. Courts have rejected the theory that this misconduct is "inherently expressive." The FACE Act "does not directly apply to [any] speech" they made while present at the synagogue "but rather prohibits three types of conduct—use of force, threat of force, and physical obstruction—which are not protected by the First Amendment." *Norton v. Ashcroft*, 298 F.3d 547, 552–53 (6th Cir. 2002).

### b. Prosecuting FACE Act crimes does not violate Defendants' right to free assembly

The First Amendment protects "the right of the people *peaceably* to assemble." U.S. Const. Amend. I (emphasis added). The key word here is "peaceably." Camins claims the mob's conduct was "peaceful," Dkt. 66-1 at 14, but that is for a jury to decide. The conduct alleged in the Complaint, which must be accepted as true at this stage, is anything but peaceful, Compl. ¶¶ 43-60, and therefore is unprotected by the Free Assembly Clause, *see Edwards v. South Carolina*, 372 U.S. 229, 236 (1963) (explaining that the Free Assembly Clause applies when there is "no violence or threat of violence"). Camins also wrongly

24

argues that the United States is applying a "content-based distinction" by targeting a "pro-Palestinian demonstration," Dkt. 66-1 at 14. Again, the FACE Act violations alleged in the Complaint stem from Defendants' conduct, not their "pro-Palestinian" views. "[T]he Act applies to anyone who violates its terms, regardless of ideology or message." *Norton* 298 F.3d at 553.

## III. Defendants' remaining arguments lack merit

### a. The Complaint adequately alleges traceability

Fry's 12(b)(1) Rule jurisdictional arguments are without merit. Fry argues that the United States does not have standing to bring this civil action because the injury the United States complains of is too far removed from the conduct in which she engaged. Dkt. 62-1 at 19-20. Fry's argument misconstrues the doctrine of standing. "[A] violation of [a] statute inherently constitutes an injury to the United States," and therefore establishes the federal government's standing. *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010). Indeed, Fry has cited no cases, "in which the government has been denied standing to enforce its own law." *Id.* *See also Bhd. of Ry. & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 242 n.4 (1966) ("We have no doubt that the United States had standing to bring [an] action" to enforce a statute which authorized the United States "to institute in the proper court and to prosecute all necessary proceedings for the enforcement" of that statute) (cleaned up). To the

25

extent that Fry argues that she did not injure, intimidate, or interfere with to Glick or other worshipers, that argument does not undermine the Court's jurisdiction, but at most goes to the merits of the United States' allegations, which are addressable via Rule 12(b)(6) or on summary judgment.

### b. The United States is not required to plead intent

Fry seeks dismissal because the Complaint does not allege that she "knew or should have known that this event would be a protected exercise of religion expression, especially since the land sale event was originally being hosted in a private home." Dkt. 62-1 at 13-14. Putting aside the fact that the Court reasonably can infer that a defendant who protests an anti-Israel event at a synagogue knows or should know that the event is religious in nature, the United States was not requires to allege that Fry "intended to interfere with anyone's religious freedom." *Id.* at 13 (capitalization altered).

The FACE Act prohibits three categories of conduct. Specifically, Section 248(a) provides that "whoever—"

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person **because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services**;

(2) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or

seeking to exercise the First Amendment right of religious freedom at a place of religious worship; or

(3) intentionally damages or destroys the property of a facility, or attempts to do so, **because such facility provides reproductive health services**, or intentionally damages or destroys the property of a place of religious worship,

shall be subject to the [criminal] penalties provided in subsection (b).

18 U.S.C. § 248(a) (emphasis added).

Crucially, while subsection (a)(1) and the reproductive-health-facilities clause of subsection (a)(3) each contains a motive requirement, subsection (a)(2) does not. Subsection (a)(1) prohibits only conduct motivated by the "express purpose of preventing such persons from obtaining or providing reproductive health services." *United States v. Wilson*, 2 F. Supp. 2d 1170, 1171 (E.D. Wis. 1998), *aff'd sub nom. United States v. Balint,* 201 F.3d 928 (7th Cir. 2000). Likewise, the reproductive-health-facilities clause of subsection (a)(3) applies only to defendants who destroy property "because such facility provides reproductive health services." 18 U.S.C. § 248(a). Subsection (a)(2), in notable contrast, contains no motive requirement or "because of" language; the word "because" is glaringly absent.

Because "Congress used specific language" in subsections (a)(1) and the reproductive-health-facilities clause of (a)(3) on one hand "but different language in" subsection (a)(2), the Court must "presume [that] different meanings were intended." *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 554 (3d Cir. 2017) (citing

27

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)). Congress included a motive requirement in subsection (a)(1) and the reproductive-health-facilities clause of (a)(3), which "shows that when Congress intended" to create a motive requirement for prohibited conduct under the FACE Act, "it knew how to do so." *Custis v. United States*, 511 U.S. 485, 492 (1994). But the "omission of similar language" from subsection (a)(2) "indicate[s] that [Congress] did not intend" to create a corresponding motive requirement for attacks on worshippers. *Id.* Thus, the United States was not required to allege that Fry intended to interfere with religious freedom.

### c. "International law" is irrelevant

Dragon frivolously argues that this Court "lacks jurisdiction" because the religious event at Congregation Ohr Torah was an "international war crime" and violated "established international law principles." Dkt. 64 at 16. According to Dragon, because the International Court of Justice ruled that Israel's "occupation" of Gaza and the West Bank "is unlawful," the exercise of federal jurisdiction here somehow violates the Fourth Geneva Convention. *Id.* at 16-18. But the International Court of Justice has no jurisdiction over the United States, *Medellin v. Texas*, 554 U.S. 759, 760 (2008), and neither its rulings nor the Fourth Geneva Convention cabin the scope of federal-question jurisdiction under 28 U.S.C. § 1331. Notwithstanding Dragon's position about Israel, "international law" is irrelevant,

28

does not limit the enforceability of American law on American soil, and certainly cannot override the First Amendment guarantees of religious freedom that the FACE Act protects.

### d. *Younger* abstention does not bar the suit against Camins

Camins argues that this court should abstain under *Younger v. Harris*, 401 U.S. 37 (1971), because New Jersey prosectors "indicted Glick and Silberberg for crimes including assault." Dkt. 66-1 at 15. But *Younger* abstention prohibits federal courts from enjoining state criminal proceedings under certain circumstances. *Younger*, 401 U.S. at 42. It does not prohibit federal civil litigation from proceeding in parallel with state criminal cases. And even if it did, a "prerequisite for *Younger* abstention is that the state proceeding must be ongoing." *Borowski v. Kean Univ.*, 68 F.4th 844, 846 (3d Cir. 2023). There are no "ongoing" state proceedings against Glick or Silberberg. Glick received a gubernatorial pardon, Dkt. 66-1 15, and Silberberg was admitted into pre-trial intervention on March 5, 2026. *See State v. Silberberg*, No. 25000580 (Essex Co., N.J., March 5, 2026). Under New Jersey law, pre-trial intervention "is a diversionary program through which certain offenders are able to avoid criminal prosecution." *State v. Gomes*, 288 A.3d 825, 830 (N.J. 2023) (citation omitted). Pre-trial intervention *disposes* of criminal charges. *Matter of Gauthier*, 222 A.3d 707, 712 (N.J. App. Div. 2019) ("Criminal charges can be disposed of

29

through a number of dispositions including . . . through PTI.").  Thus, there are no ongoing state court proceedings.

### e. The Court may not consider the extrinsic evidence introduced by Sharif

Defendant Sharif impermissibly attempts to secure dismissal by introducing extrinsic evidence.  He attaches as an exhibit "all the footage" that he obtained from the "Essex County Prosecutor's Office," including police body cameras, bystander videos, and surveillance footage.  Dkt. 65-1 at 2.  He argues that the Court may consider this evidence, as well as a "summary video" that he made, *id.*, Exh. C, as compared with "extrinsic material that is selectively quoted or relied upon" in the Complaint.  *Id.* 10.  He then claims that his videos "incontrovertibly contradicts" the allegations in the Complaint.  *Id.* 13.

"[A] court considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may consider *only* the allegations contained in the pleading to determine its sufficiency."  *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016).  Whenever "matters outside the pleadings are presented to and not excluded by the court, the motion [under Rule 12(b)(6)] must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).[5]

---

[5] Of course, summary judgment is inappropriate at this stage of litigation where there are significant disputes over material facts.

There are only two exceptions to this rule. First, a district court "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993). The videos provided by Sharif do not trigger this exception. This exception "seeks to prevent . . . the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). In other words, the exception applies to situations where the meaning of an extrinsic record can be construed as a matter of law—a situation applicable to legal documents such as contracts, deeds, licenses, and the like. But video footage is not capable of being construed as a matter of law. *See Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1299 (10th Cir. 2025) (Body camera "videos' contents are subject to reasonable dispute.") (quotation marks and citation omitted). Moreover, this exception applies only when a plaintiff's complaint is "based" on such a document. *In re Burlington*, 114 F.3d at 1426. The United States' complaint is not based on the videos that Sharif submits. It is based on the actions of Defendants of which the videotape may or may not be admissible

31

evidence that may or may not be contradicted by eyewitness testimony—all matters to be resolved at trial and not on a motion to dismiss.

Second, a court may, without converting a 12(b)(6) motion into one for summary judgment, consider "matters of public record." *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 127 (3d Cir. 2016). "Courts have defined a public record, for purposes of what properly may be considered on a motion to dismiss, to include criminal case dispositions such as convictions or mistrials, letter decisions of government agencies, and published reports of administrative bodies." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993) (citations omitted). Not included within "public records" are documents to which the public has anything other than "unqualified access." *Id.* Under New Jersey law, police body footage is not subject to such an unqualified access. *See generally Fuster v. Twp. of Chatham*, 328 A.3d 894 (N.J. 2025) (discussing New Jersey's statutory provisions exempting body camera footage from general disclosure requirements). Furthermore, "videos differ from public records containing indisputable facts, like birth or death certificates. Instead, the videos' contents are subject to reasonable dispute." *Fuqua*, 157 F.4th at 1299 (internal citations and quotations omitted). Sharif argues that his videos show one thing, whereas the Complaint alleges another. That is a paradigmatic factual dispute incapable of resolution at this stage.

The cases relied on by Sharif are inapposite, and some undermine his argument. For example, in *Doriety v. Sletten* the Fourth Circuit refused to permit consideration of body camera footage at a motion to dismiss stage in a §1983 excessive force claim case because the video in question because "[i]t [wa]s difficult to discern many critical details from the video." 109 F.4th 670, 680 (4th Cir. 2024). The Court noted that the "video d[id] not demonstrate the entire direction in which the stolen car was moving in relation to where the officer stood" nor did it "clearly depict . . . the location of the officer, the path of the stolen car, or the distance between the officer and the stolen car." *Id.* As a result, the Court held that "the video recording did not blatantly contradict the plaintiff's allegations . . .." *Id.* So too here. The body camera footage that Sharif submitted does not show the entirety of the events, shows only one particular angle, and in any event in no way undermines Plaintiff's allegations that Defendants "physically obstructed" access to Congregation Ohr Torah. *Scott v. Harris*, 550 U.S. 372 (2007) also offers no help to Sharif. In that case, the Supreme Court considered a videotape on a motion to dismiss because the video contained the entirety of interaction, and there was no "contention that what it depicts differs from what actually happened." *Id*. at 378. Here, on the other hand, while the United States does not allege that "th[e] videotape was doctored or altered in any way," *id*., the tape itself makes it clear that it does not capture the entirety of events forming the basis of the Complaint. Thus, even if the

33

Court were inclined to consider the video at this stage, it would still have to view it through the lens that is most favorable to the United States. *See Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024) (endorsing an approach where "on a motion to dismiss, [the district court] considers video evidence that discredits a plaintiff's account of the facts but views the video in the light most favorable to the plaintiff.").

## CONCLUSION

Because the United States adequately pleaded facts supporting all causes of actions against each of the Defendants, this Court should deny Defendants' motions to dismiss.

DATED: March 23, 2026.                    Respectfully submitted,

                                          HARMEET K. DHILLON
                                          Assistant Attorney General
                                          Civil Rights Division

                                          JESUS A. OSETE
                                          Principal Deputy Assistant
                                          Attorney General
                                          Civil Rights Division

                                          R. JONAS GEISSLER
                                          Deputy Assistant Attorney
                                          General Civil Rights
                                          Division

                                          /s/ Gregory Dolin
                                          GREGORY DOLIN
                                          Senior Counsel
                                          Civil Rights Division

                                          RICHARD C. GOEMANN
                                          MARLYSHA MYRTHIL
                                          Senior Trial Attorneys
                                          Civil Rights Division

                                          U.S. Department of Justice
                                          950 Constitution Ave., NW
                                          Washington, DC 20530
                                          202-598-9251
                                          gregory.dolin@usdoj.gov

35