# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

  *Plaintiff,*

v.

PARTY FOR SOCIALISM AND LIBERATION NEW JERSEY, AMERICAN MUSLIMS FOR PALESTINE NEW JERSEY, TOVA FRY a/k/a TERRY KAY, ALTAF SHARIF, MATT DRAGON, ERIC CAMINS, JANE DOE, and JOHN DOE,

  *Defendants.*

No. 2:25-cv-16049

Hon. Katharine S. Hayden, U.S.D.J.

## [PROPOSED] BRIEF OF STANDWITHUS AND FIRST LIBERTY INSTITUTE AS AMICI CURIAE IN SUPPORT OF PLAINTIFF

Mark Roselli, Esq.
Roselli Griegel Lozier, P.C.
1337 State Highway 33
Hamilton, New Jersey 08690
Telephone: 609-586-2257
Email: mroselli@roselligriegel.com

Jeremiah G. Dys*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Ste. 1600
Plano, TX 75075
Telephone: (972) 941-4444
Email: jdys@firstliberty.org
*Pro hac vice application forthcoming*

*Counsel for Proposed Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................... i

TABLE OF AUTHORITIES .............................................................................. ii

INTERESTS OF AMICI CURIAE ...................................................................... 1

ARGUMENT ....................................................................................................2

  I.  THE FACE ACT PROVIDES BROAD PROTECTION FOR
      RELIGIOUS EXERCISE, AND THE FIRST AMENDMENT
      BARS COURTS FROM SECOND-GUESSING RELIGIOUS
      EXERCISE ............................................................................... 2

      A.  As a Matter of Law, Civil Courts Do Not Determine What
          Constitutes Sincerely Held Religious Beliefs or Practice ....................... 4

      B.  The Ohr Torah Event on November 13, 2024, Constituted Protected
          Religious Exercise Involving Core Jewish Practices of Aliyah and
          Shloshim ................................................................................ 7

          1.  Aliyah ......................................................................... 8

          2.  Shloshim . ..................................................................... 12

  II.  THE FACE ACT PROTECTS ACCESS TO SYNAGOGUES AND
      THEIR SURROUNDING AREAS, NOT JUST THE ENTRANCE ..........13

      A. Religious Adherents Collectively Recognize That a Synagogue, Its
         Ingress and Egress, and Its Parking Lot Are All Primarily Used to
         Gather or Hold Religious Worship Activities .........................................15

      B.  Protecting the Ingress, Egress, and Parking Lot for This Synagogue
         Is Crucial Because Many Jews Walk to Synagogue Every Day ........... 17

CONCLUSION . .............................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025) .................................................................................................................. 5

*Emp. Div. v. Smith*, 494 U.S. 872 (1990) ................................................................ 10

*Helmann v. Codepink Women for Peace*, No. 2:24-cv-05704-SVW-PVC (C.D. Cal. June 13, 2025), 2025 WL 3030582 ................................................ 6, 11

*Holt v. Hobbs*, 574 U.S. 352 (2015) ........................................................................ 11

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012) ............................................................................................. 5

*Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94 (1952).................................... 4, 5

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ......................................... 10

*Moussazadeh v. Tex. Dep't of Crim. Just.,* 703 F.3d 781 (5th Cir. 2012)............ 5, 6

*Our Lady of Guadalupe v. Morrisey-Berru*, 591 U.S. 732 (2020) ....................... 4, 5

*People ex rel. Spitzer v. Kraeger*, 160 F. Supp. 2d 362 (N.D.N.Y. 2001) ............. 14

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969) ............................................................................................. 4

*Thomas v. Rev. Bd.*, 450 U.S. 707 (1981)........................................................... 4, 11

*United States v. Ballard,* 322 U.S. 78 (1944) .......................................................... 4

*United States v. Gregg*, 32 F. Supp. 2d 151 (D.N.J. 1998) ................................... 14

*United States v. Lindgren*, 883 F. Supp. 1321 (D.N.D. 1995).............................. 14

*United States v. Scott*, 958 F. Supp. 761 (D. Conn. 1997) .................................... 14

*United States v. Seeger*, 380 U.S. 163 (1965) ......................................................... 5

*United States v. White*, 893 F. Supp. 1423 (C.D. Cal. 1995) ................................ 14

*Watson v. Jones*, 80 U.S. 679 (1871)..............................................................................5

*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014)..............................................5

**Statutes**

18 U.S.C. § 248(a)(2) ........................................................................... 2, 13, 15, 18

18 U.S.C. § 248(e)(4) ................................................................................ 13, 18, 19

**Other Authorities**

Artzot Ha'Chaim ...................................................................................................9

Babylonian Talmud Gittin 8b................................................................................ 8, 9

Babylonian Talmud, Bava Kamma 80b .....................................................................9

Babylonian Talmud, Ketubot 110b .........................................................................8

Congregation Ohr Torah, *Prayer Services*...................................................16

Deuteronomy 11:31 ..............................................................................................8

Deuteronomy 34:8 ..............................................................................................12

Genesis 50:13 .......................................................................................................8

H.R. Rep. No. 103-488 (1994) ...............................................................................2

*Moed Katan* 27b–28a; Maimonides, *Mishneh Torah*, Hilchot Avel 6–7 ...............12

Numbers 20:29 ...................................................................................................12

Numbers 33:53 .....................................................................................................8

Peninei Halakha, Shabbat 9:12..............................................................................9

Rachel Quednau, "For Orthodox Jewish Neighborhoods, Community and Walkability are Key" (Strong Towns, June 7, 2017).........................................18

Ramban (Nachmanides) on Babylonian Talmud Shabbat 130b.............................9

Sifrei, Re'eh, 53 ................................................................................................ 8

Shulchan Aruch (Code of Jewish Law), Orach Chayim 306:11……………….9, 18

## INTERESTS OF AMICI CURIAE[1]

StandWithUs is a nonprofit, nonpartisan educational organization dedicated to educating the public about Israel and combating antisemitism. Its legal arm, StandWithUs Saidoff Law, works to address anti-Jewish discrimination, harassment, and interference with Jewish religious life. Since its founding in 2015, StandWithUs Saidoff Law has received thousands of reports from Jewish individuals and institutions across the United States who have faced intimidation, exclusion, and harassment because of their Jewish identity or their participation in Jewish communal and religious activities. In response, the organization has used a range of legal tools to protect these individuals and institutions. Notably, StandWithUs's partner organization, the StandWithUs Center for Legal Justice, was among the first to bring claims under the FACE Act on behalf of Jewish individuals.

First Liberty Institute ("First Liberty") is a nonprofit, public interest law firm dedicated to defending religious liberty for all Americans through pro bono legal representation of individuals and institutes of diverse faiths— Catholic, Protestant, Muslim, Jewish, the Falun Gong, Native American religious practitioners, and others. First Liberty has won several religious freedom cases at the U.S. Supreme Court, including *Olivier v. City of Brandon*, 607 U.S. ___ (2026); *Groff v. DeJoy*,

---

[1] *Amici* state that, other than *Amici* and their counsel, no party, their counsel, or any other person authored this brief (in whole or in part) or contributed money intended to fund the preparation or submission of this brief.

600 U.S. 447 (2023); *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022); *Carson v. Makin*, 596 U.S. 767 (2022); and *American Legion v. American Humanist Association*, 588 U.S. 29 (2019). First Liberty has significant experience litigating under the Freedom of Access to Clinic Entrances Act ("FACE Act"), including in *Christian & Jewish Alliance v. Brunner, et al.*, No. 25-cv-02992 (S.D. Cal. Nov. 4, 2025) and *Heartbeat of Miami, Inc. v. Jane's Revenge, et al.*, No. 23-cv-705 (M.D. Fl. (Mar. 29, 2023). As a nonprofit committed to protecting First Amendment freedoms, First Liberty can assist the Court in drawing the proper balance here.

## ARGUMENT

### I.    The FACE Act Provides Broad Protection for Religious Exercise, and the First Amendment Bars Courts from Second-Guessing Religious Exercise.

The FACE Act protects "any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). Congress expressed concern about private interference with individuals attending places of religious worship and enacted the statute to provide broad federal protection against such interference. *See* H.R. Rep. No. 103-488 (1994), at §6 "religious worship" (discussing protection of religious exercise at places of worship).

The Complaint at hand alleges that Defendants targeted congregants at Congregation Ohr Torah during an event that included prayer, a religious memorial

2

service, a Torah sermon, religious songs with biblical verses, prayerful dancing, and education about what attendees understand to be a religious obligation to live in Israel. Compl. ¶¶ 17, 28, Dkt. 1. Nevertheless, Defendants ask the Court to declare that the event itself was not religious. They do so because Plaintiff's claims turn, in part, on whether attendees were seeking to enter the synagogue to exercise their First Amendment religious exercise rights. In support of their position, Defendants advance arguments that rest on a fundamental mischaracterization of Jewish religious practice, including dismissive and disrespectful analogies that attempt to distort what is a matter of religious observance and recast it as a purely secular activity.

Defendant AMP asserts that the event "could not plausibly be interpreted" as an exercise of religious freedom.[2] Defendant Sharif similarly argues that holding an event in a synagogue does not make it religious, comparing it to "holding a bingo night in a church basement."[3] Defendant Dragon likewise characterizes the gathering as nonreligious.[4] Defendant Fry even goes as far as to argue that the Government has some obligation to identify a "passage from Jewish law" and

---

[2] *United States v. Party for Socialism & Liberation N.J.*, No. 2:25-cv-16049 (D.N.J. Feb. 20, 2026), Mem. in Support of American Muslims for Palestine New Jersey's Motion to Dismiss (Dkt. 63-1), at p. 7.

[3] *Id.,* Mem. in Support of Def. Altaf Sharif's Mot. to Dismiss (Dkt. 65-1), at p. 1.

[4] *Id.,* Mem. in Support of Def. Matt Dragon's Mot. to Dismiss (Dkt. 64), at p. 20.

because it has not, it is "giving voice to one of the oldest...anti-Semitic trope(s)" about Jews being "consumed with money."[5]

Each of these arguments is fundamentally flawed. They twist the facts alleged in the Complaint, disregard settled law prohibiting courts from reinterpreting or narrowing religious practice, and marginalize the lived experience of the Jewish community that was impacted by Defendants' riot.

**A. As a Matter of Law, Civil Courts Do Not Determine What Constitutes Sincerely Held Religious Beliefs or Practice.**

The Supreme Court has long made clear that courts are not equipped to judge the content of religious beliefs. *See, e.g., United States v. Ballard,* 322 U.S. 78, 87 (1944) (finding that the veracity of religious views cannot be "subject to trial before a jury" because "[w]hen the triers of fact undertake that task, they enter a forbidden domain"); *Thomas v. Rev. Bd.*, 450 U.S. 707, 715–16 (1981) ("[I]t is not within the judicial function and judicial competence to inquire whether [religious adherents] correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."). Further, the First Amendment prevents courts from delving into internal disputes over religious doctrine. *See Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).

---

[5] *Id.,* Mem. in Support of Def. Tova Fry's Mot. to Dismiss (Doc. 62-1), at p. 19.

In *Our Lady of Guadalupe v. Morrisey-Berru*, 591 U.S. 732, 737 (2020), the Supreme Court held that "[t]he First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" (citing *Kedroff v. Saint Nicholas Cathedral*, 344 U. S. 94, 116 (1952)). "[T]he Religion Clauses protect the right of … religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe*, 591 U.S. at 746 (citing *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 186 (2012)). "State interference in that sphere would obviously violate the free exercise of religion." *Id.* at 746. Neither can courts parse through religious beliefs or treat certain practices with disfavor. *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 249 (2025) ("[O]fficial differentiation on theological lines is fundamentally foreign to our constitutional order") (citing *Watson v. Jones*, 80 U.S. 679, 728 (1871)).

Because courts cannot decide matters of religious doctrine or practice, the law's concern is with sincere religious belief as lived and understood by the believers at hand, not with whether an adversary accepts that theology. *See United States v. Seeger*, 380 U.S. 163, 185 (1965) ("courts['] . . . task is to decide whether the beliefs professed by a registrant are sincerely held"). Courts should handle sincerity with a

5

"light touch." *Moussazadeh v. Tex. Dep't of Crim. Just.,* 703 F.3d 781, 790–92 (5th Cir. 2012), *as corrected* (Feb. 20, 2013); *see also Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014) (courts should treat sincerity with "judicial shyness"). That principle is especially important in a case like this one, where Defendants attempt to strip a synagogue event of its religious character by ignoring the religious setting, religious purpose, and religious content of the gathering as a whole.

Another federal court recently upheld these principles in an analogous FACE Act case. In *Helmann v. Codepink Women for Peace*, the Central District of California addressed a motion to dismiss arising from disruptions outside an Orthodox synagogue's Aliyah event. The court explained, "[a]t the motion to dismiss stage, [it] takes Plaintiffs' allegations regarding the religious nature of the Aliyah Event as true and therefore that attempts to enter the Synagogue to attend that event pertained to an exercise of First Amendment rights." No. 2:24-cv-05704-SVW-PVC (C.D. Cal. June 13, 2025), 2025 WL 3030582, *2, n.2. Especially at the motion to dismiss stage, when the Court must take the allegations in the light most favorable to the Plaintiff, the Court should accept the religious nature of the event, as alleged, and refuse Defendants' invitation to second-guess such allegations and/or replace them with Defendants' proffered narrative.

6

**B. The Ohr Torah Event on November 13, 2024, Constituted Protected Religious Exercise Involving Core Jewish Practices of Aliyah and Shloshim.**

Defendants' arguments are not merely legally unsound; they are factually false. The Complaint alleges that the event at Congregation Ohr Torah "was to include prayer, a religious memorial service for the late Rabbi Avi Goldberg, a Torah sermon, religious songs with biblical verses, prayerful dancing, educational activities about the religious obligation to live in Israel, a real estate fair, and a festive barbecue in the synagogue's parking lot—all part of the religious observance." Compl. ¶ 28, Dkt. 1.

Jewish religious life, particularly in Orthodox communities, is communal and integrated in nature. Prayer, Torah learning, mourning, song, remembrance, and practical guidance on how to fulfill religious obligations are all understood as religious practices. A synagogue gathering may encompass all of these elements simultaneously and still be unmistakably religious. Appreciating the Aliyah and Shloshim components of the November 13, 2024, event at Congregation Ohr Torah is therefore essential to understanding both its religious character and the impact of Defendants' riot on the affected Jewish community.

7

## 1. Aliyah

Aliyah literally means "ascent" or "going up." In Jewish life, however, the term has a deeper meaning: it refers to going up to live in Eretz Yisrael, the Land of Israel, which is the ancestral homeland of the Jewish people—indeed, the very land in which the ethno-religion of Judaism originated. For many Orthodox Jews (and even non-Orthodox Jews), Aliyah is not a relocation, a political statement, or a cultural preference. It is bound up with covenant, peoplehood, holiness, and mitzvah (religious commandment). It is understood as an expression of Jewish religious life because where a Jew lives and how a Jew seeks closeness to God through life in the land are central to Jewish prayer, scripture, and tradition.

The importance of Aliyah and its role as a predominant aspect of the Jewish faith date back millennia. The term is used in the Torah to describe the return of Jacob's bones from Egypt to the Land of Israel.[6] The Talmud explains that Judaism includes a religious commandment—a mitzvah—to buy land in Israel and to dwell there.[7] In fact, the Talmud makes clear that the religious commandment to make Aliyah, which specifically includes buying a home in Israel, "is equivalent to all of the other commandments in the Torah."[8]  Indeed, the specific commandment to

---

[6] *See* Genesis 50:13.
[7] *See, e.g.*, Babylonian Talmud, Ketubot 110b; Numbers 33:53; Deuteronomy 11:31.
[8] *See, e.g.*, Babylonian Talmud Gittin 8b; Sifrei, Re'eh, 53.

8

purchase a home in Israel and to dwell there is so special that some Jewish scholars believe it overrides other commandments.[9] The mitzvah of Aliyah is so important that it merits its own discussions in the Talmud and other rabbinic texts.[10] And as with other mitzvot, the preparations to make Aliyah—preparing to return to and dwell in Israel—are also considered at least a partial fulfillment of the mitzvah of Aliyah.[11] In other words, educating oneself about the process of returning to Israel, the options for purchasing a home there, and other related acts fulfills a religious obligation.[12]

That religious meaning is why an Aliyah event at a synagogue does not stop being religious because it includes practical information about satisfying what many see as a commandment. For a congregant who sincerely believes that living in Israel is religiously significant, learning how to take concrete steps toward that life—including where to live, how to establish a home, and how to prepare to move—are all elements of living out that belief. The practical component is not separate from the religious one; it is simply how the religious commitment is expressed in real life.

---

[9] *See* Babylonian Talmud, Bava Kamma 80b.

[10] *See, e.g.*, Babylonian Talmud, Gittin 8b; Shulchan Aruch (Code of Jewish Law), Orach Chayim 306:11.

[11] *See* Peninei Halakha, Shabbat 9:12 (citing Ramban (Nachmanides) on Babylonian Talmud Shabbat 130b); Rivash §387; *see also* Artzot Ha'Chaim, p. 2 (discussing how every step on the way is a separate fulfillment of a commandment).

[12] *See id.*

Defendants' analogy about bingo utterly misses the point and represents a gross mischaracterization of how Judaism is practiced. A court cannot determine whether a synagogue event is "religious enough" by peeling away the parts that look unfamiliar or insufficiently liturgical to outsiders. That approach would artificially narrow Jewish religious practice and privilege only the forms of worship a court finds easy to recognize. But the First Amendment protects religion as believers practice it. As the Supreme Court has long held, "The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (citing *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990)). Thus, the Free Exercise Clause does not protect only formal prayer services. It also protects religious study, teaching, communal meals, and preparation to fulfill a mitzvah.

The Complaint alleges that Dr. Moshe Glick, a devout Jew, organized "a religious event centered on the Jewish obligation to live in the Land of Israel, a tenet of Jewish faith," and designated it as an "Israel real estate fair and 'Ruach' (Spiritual) event." Compl. ¶ 17, Dkt. 1. The Complaint further alleges that the event included prayer and other religious components at the synagogue. Compl. ¶ 28, Dkt. 1. Those

10

allegations are more than sufficient, at the motion to dismiss stage, to overcome Defendants' objections, and to invoke the FACE Act's protections, which explicitly apply to people seeking to exercise their First Amendment rights of religious freedom. *Helmann*, No. 2:24-cv-05704-SVW-PVC, at *2 n.2.[13]

Nor does it matter that Jews do not all hold identical views about Aliyah. Jewish communities, like other religious groups, are not monolithic; nor are denominations within the broader Jewish community. Some Jews regard Aliyah as an especially weighty mitzvah; others understand it differently. But the Court need not—and must not—choose among those views. In *Holt v. Hobbs*, 574 U.S. 352, 362 (2015), the Supreme Court rejected a similar contention that "not all Muslims believe that men must grow beards." Even if the petitioner's belief were "idiosyncratic[,] . . . [t]he guarantee of the Free Exercise Clause, is 'not limited to beliefs which are shared by all of the members of a religious sect.'" *Id.* (citing *Thomas*, 450 U.S. at 715–716). The question for the Court here is simple: whether the Complaint plausibly alleges that the congregants here were engaging in religious exercise as they sincerely understood it. It plainly does.

---

[13] *Helmann* is particularly instructive because it involved the same kind of synagogue-based Aliyah event, and the court rejected Defendants' invitation to dismiss the complaint based on recharacterization of the event as nonreligious.

### 2. Shloshim

The same is true of the event's memorial component. In Jewish practice, Shloshim—literally, "thirty"—refers to the thirty-day mourning period following burial and is a recognized part of Jewish mourning and communal religious life. The concept has deep roots in Jewish law and scripture. The Torah itself describes thirty-day mourning periods for major leaders: "The Israelites wept for Moses in the plains of Moab for thirty days"[14] and "the whole house of Israel bewailed Aaron thirty days."[15] Rabbinic law builds on these foundations, by establishing Shloshim as a defined period of extended mourning practices and restrictions.[16]

A Shloshim observance often includes prayer, Psalms, Torah learning or a Torah message, words in memory of the deceased, and communal reflection on the spiritual legacy of the person who has died. In the case at hand, the Complaint alleges that the event included "a religious memorial service for the late Rabbi Avi Goldberg," along with a Torah sermon, religious songs with biblical verses, and prayerful dancing. Compl. ¶ 28, Dkt. 1. A synagogue gathering that brings together prayer, Torah, memorial observance, and communal remembrance does not sit at the edge of religious exercise. It falls squarely within it.

---

[14] Deuteronomy 34:8.
[15] Numbers 20:29.
[16] *See Moed Katan* 27b–28a; Maimonides, *Mishneh Torah*, Hilchot Avel 6–7.

12

Again, the Court need not parse the finer points of Jewish mourning practice to recognize that a complaint alleging a religious memorial service inside a synagogue—intertwined with prayer, Torah teaching, biblical song, and other acts of worship—describes conduct that is religious in nature. Attendees at the Ohr Torah event were therefore seeking to exercise their First Amendment right to religious worship. Section 248(a(2) of the FACE Act was enacted to protect precisely such forms of religious exercise.

## II. The FACE Act Protects Access to Synagogues and Their Surrounding Areas, Not Just the Front Entrance.

The FACE Act protects people "lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). The FACE Act's additional clauses, which focus on access, confirm that Congress did not intend to protect only religious activity occurring inside a sanctuary but also the ability of worshipers to reach and leave that space without obstruction. The statute's explicit prohibition of conduct that renders passage "to or from" a place of worship "unreasonably difficult or hazardous" reinforces that point. 18 U.S.C. § 248(e)(4). In short, a place of religious worship necessarily encompasses the surrounding areas through which worshipers must travel to access the site. Any narrower reading would be unworkable. A statute that only protects the literal front door of a synagogue, while permitting obstruction at

13

its sidewalks or parking areas, would leave religious exercise effectively unprotected.

Courts interpreting the FACE Act have applied this common-sense understanding and concluded that it is not necessary to show that a facility was shut down, that individuals were entirely unable to enter, or that services were ultimately denied. *People ex rel. Spitzer v. Kraeger*, 160 F. Supp. 2d 362, 373 (N.D.N.Y. 2001) (citing *United States v. Gregg*, 32 F. Supp. 2d 151, 156 (D.N.J. 1998)). Rather, "interference, harassment, or traffic hazards when attempting to enter or leave . . . have all been found to meet the 'unreasonably difficult or hazardous' standard." *Id.* (citing *United States v. Scott*, 958 F. Supp. 761, 775–76 (D. Conn. 1997); *United States v. Lindgren*, 883 F. Supp. 1321, 1330–31 (D.N.D. 1995); *United States v. White*, 893 F. Supp. 1423, 1431–32 (C.D. Cal. 1995)).

Here, the Complaint alleges that Congregation Ohr Torah is a synagogue; that Defendants broke through a police line and entered synagogue property; that the event extended onto synagogue grounds, including the parking lot; and that the mob obstructed access to and egress from the synagogue. Compl. ¶¶ 1, 11–16, 27–28, 39–42, 55–58, 66, Dkt. 1. These allegations describe precisely the type of "place of worship" and interference the FACE Act was enacted to prevent: obstruction not only inside a place of worship but also at its entrance, on its grounds, and along the

14

routes by which worshipers access it. The statute protects access to the synagogue as a whole, not just the precise point at which a worshiper crosses the threshold.

## A. Religious Adherents Collectively Recognize That a Synagogue, Its Ingress and Egress, and Its Parking Lot Are All Primarily Used to Gather or Hold Religious Worship Activities.

From a traditional Jewish perspective, a synagogue is not merely the room where formal liturgy begins. It is the communal religious home in which Jews pray, hear Torah, mourn, celebrate, sing, gather, eat, and move together through worship. In Orthodox life, those forms of observance are interwoven throughout the synagogue's grounds and its surrounding area. People arrive early, gather between services, move in and out with family members and guests, and continue religious and communal observance across synagogue grounds, often including in the parking lot of the synagogue itself. In order to make good on Congress' commitment, as set forth in the FACE Act, to protect "any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom," courts must construe the plain meaning of the "place of religious worship" phrase broadly enough to encompass the space where that worship occurs, as well as access to and from such space. 18 U.S.C. § 248(a)(2). A synagogue is experienced by its community as a lived religious space, one that does not merely begin at the sanctuary front door.

15

The Complaint in this case alleges that the event at Congregation Ohr Torah included prayer, a religious memorial service, a Torah sermon, religious songs with biblical verses, prayerful dancing, educational activities about a religious obligation, and a festive barbecue in the synagogue's parking lot, "all part of the religious observance." Compl. ¶ 28, Dkt. 1. Based on those allegations, the parking lot was not some detached secular annex. It was part of an integrated synagogue-based religious gathering. The same is true of the synagogue grounds through which congregants arrived, gathered, and moved during the event.[17] The Government's opposition to the Defendants' motions to dismiss likewise explains that Defendants entered the synagogue's real property, that the mob spread out on synagogue grounds, and that Sharif's assault on Silberberg continued from the synagogue's

---

[17] Defendant Dragon attempts to argue that Wednesday night is "not notable for Jewish religious gatherings." *See supra* n.8; Mem. in Support of Def. Matt Dragon's Mot. to Dismiss (Dkt. 64), at p. 20. This is false. Congregation Ohr Torah's own prayer-services page states that "Ohr Torah has morning and evening services each day." A Wednesday-evening gathering at this synagogue therefore was not some implausible departure from Jewish religious life. It was entirely consistent with the synagogue's public description of its ordinary religious practice, and in Orthodox communities, like Ohr Torah, weekday prayer gatherings are routine and have been ongoing for over a decade. See Congregation Ohr Torah, *Prayer Services* (website) (last visited Mar. 30, 2026). https://www.congregationohrtorah.org/.

16

front lawn into the synagogue parking lot.[18] A court should not flatten that religious reality and limit the FACE Act's protections by pretending the synagogue, and worshipers' ability to enter and exit safely, involves only the sanctuary door.

Defendants' effort to carve the synagogue into supposedly "religious" and "nonreligious" zones is inconsistent with both the factual allegations and the law. Under the FACE Act, what matters is how the religious adherents understand use of the space. Here, the Complaint describes a unified, synagogue-based religious gathering extending across the property, including the areas through which congregants access and move within it. The Court should reject Defendants' attempt to narrow that reality. The FACE Act protects not only the synagogue interior as it is actually experienced and used, but also the ingress, egress, and surrounding areas necessary for worshipers to access it.

**B. Protecting the Ingress, Egress, and Parking Lot for This Synagogue Is Crucial Because Many Jews Walk to Synagogue Every Day.**

Ensuring that the Court protects the ingress and egress to this synagogue is also crucial because for many observant Jews, walking is the ordinary way to reach their synagogue. Living within walking distance of synagogue is a very common

---

[18] *United States v. Party for Socialism & Liberation New Jersey et al.*, No. 2:25-cv-16049 (D.N.J. Mar. 23, 2026), United States' Opp. to Defs.' Mots. to Dismiss (Doc. 82), at pp. 2–5, 18–21.

feature of Orthodox Jewish life.[19] Therefore, the sidewalk, curb, driveway, and path from street to entrance are not incidental to worship; they are often the means by which worshipers get to worship and adhere to religious commandments not to drive on the Sabbath and holidays.[20] Crucially, the Complaint itself alleges that the event was moved to Congregation Ohr Torah, "a synagogue a short walk from Glick's home." Compl. ¶ 27, Dkt. 1. It further alleges that the mob's unpermitted blockage obstructed the public sidewalk on one side of the synagogue and "rendere[d] passage to or from such a . . . place of religious worship unreasonably difficult or hazardous," 18 U.S.C. § 248(e)(4), such that worshipers would have had to walk either through an angry mob or into a busy street in low visibility. Compl. ¶ 66, Dkt. 1. Those are classic allegations of interference with ingress and egress.

Section 248(a)(2) of the FACE Act was enacted to protect religious worshipers in exactly such situations. A mob does not need to chain the sanctuary doors shut to violate the statute. Surrounding the entrance, overtaking the approach

---

[19] *See* Rachel Quednau, "For Orthodox Jewish Neighborhoods, Community and Walkability are Key," Strong Towns, June 7, 2017, available at https://archive.strongtowns.org/journal/2017/6/7/orthodox-jewish-neighborhoods-community-walkability.

[20] Observant (particularly Orthodox) Jews refrain from driving on the Sabbath, which results in the common practice of walking to synagogue. *See* Shulchan Aruch, Orach Chayim 301–404 (laws of Shabbat), Exodus 20:8–10 (commandment to observe the Sabbath), Exodus 16:29 (basis for limits on travel).

18

to the synagogue, or making passage to or from the synagogue unreasonably difficult or hazardous can accomplish the same unlawful result. 18 U.S.C. § 248(e)(4). And here the Complaint goes further still: it alleges that Defendants surged through a police line, entered synagogue property, disrupted the event on the grounds, and continued into the parking lot. Compl. ¶¶ 39-42, 55-58, Dkt. 1. The Court should reject the notion that only the front door to the synagogue is protected, and everything outside is fair game for obstruction and interference. Congregation Ohr Torah, its front lawn, its parking lot, and the immediate routes by which worshipers enter and leave are precisely the kind of place-based religious access Congress chose to protect in enacting the FACE Act. Defendants' contrary theory should be rejected to ensure Jewish worshippers are able to meaningfully exercise the protections envisioned by Congress.

## CONCLUSION

The Court should unequivocally reject any argument that Ohr Torah Congregants were not "lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship," conduct expressly protected by the FACE Act.

19

Respectfully Submitted,

__/s/ *Mark Roselli*_____

Mark Roselli, Esq.
Roselli Griegel Lozier, PC
1337 State Highway 33
Hamilton, New Jersey 08690
Telephone: 609-586-2257
Email: mroselli@roselligriegel.com

Jeremiah G. Dys*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Ste. 1600
Plano, TX 75075
Telephone: (972) 941-4444
Email: jdys@firstliberty.org
*Pro hac vice application
forthcoming*

20